**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
Jason A. Ibey, Esq. (SBN: 284607)
jason@kazlg.com
2700 N. Main Street, Ste. 1000
Santa Ana, California 92705
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

**HYDE & SWIGART**
Joshua B. Swigart, Esq. (SBN: 225557)
josh@westcoastlitigation.com
2221 Camino Del Rio South, Suite 101
San Diego, CA 92108
Telephone: (619) 233-7770
Facsimile: (619) 297-1022

*Attorneys for Plaintiff,*
Rafael David Sherman

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RAFAEL DAVID SHERMAN, individually and on behalf of all others similarly situated,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**YAHOO! INC., a Delaware Corporation,**<br><br>**Defendant.** | **Case No.: 13-CV-00041-GPC-WVG**<br><br>**CLASS ACTION**<br><br>**DECLARATION OF RANDALL A. SNYDER IN SUPPORT OF PLAINTIFF RAFAEL DAVID SHERMAN'S OPPOSITION TO DEFENDANT YAHOO! INC.'S MOTION FOR SUMMARY JUDGMENT** |

1

2

**DECLARATION OF RANDALL A. SNYDER**

I, Randall A. Snyder, hereby declare as follows:

1.  My name is Randall A. Snyder. I am an adult over the age of 18 and a resident of the state of Nevada. I have personal knowledge of each of the matters stated herein, and if called to testify I could and would testify competently about them.

2.  I am an independent telecommunications technology consultant and reside at 8113 Bay Pines Avenue, Las Vegas, Nevada, 89128. I have been retained by Kazerouni Law Group, APC in the matter *Sherman v. Yahoo! Inc.*, 3:13-CV-0041-GPC-WVG (S.D. Cal.) to provide my expert opinions relating to technology described within the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") and the claims by Plaintiff that Yahoo! Inc. ("Yahoo!" or "Defendant") violated the TCPA. In particular, I have been asked to determine whether the Defendant employed equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator; whether the Defendant, in fact, used such equipment; whether the Defendant employed equipment which has the capacity to dial telephone numbers without human intervention; whether the Defendant, in fact, dialed such numbers without human intervention; and whether the equipment used by the Defendant was used to send unsolicited cellular text messages.

3.  My opinions in this declaration are based on my knowledge, education, experience, training and my review of the following documents in this case: Class Action: Complaint for Damages and Injunctive Relief Pursuant to the Telephone Consumer Protection Act, 47 U.S.C. § 227, Et Seq.; Defendant Yahoo! Inc.'s Answer to Complaint; Declaration of Nitu Choudhary in Support of Yahoo! Inc.'s Motion for Summary Judgment; Memorandum of

**Kazerouni Law Group, APC**
Santa Ana, California

Points and Authorities in Support of Yahoo! Inc.'s Motion for Summary Judgment; Yahoo! Inc.'s Notice of Motion and Motion for Summary Judgment; Defendant's Statement of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment; Defendant's Responses to Plaintiff's Request for Admission, Set One; Defendant's Answers to Plaintiff's Interrogatories, Set One; Defendant's Response to Plaintiff's Amended Request for Production of Documents and Tangible Things, Set One; Defendant's Amended Responses to Plaintiff's Interrogatories, Set One; Defendant's Amended Responses to Plaintiff's Request for Admission, Set One; Defendant's Amended Responses to Plaintiff's Amended Request for Production of Documents and Tangible Things, Set One; Yahoo – Sprint Wireless Internet Service Agreement (dated February 12, 2003); Y! PC2SMS application description, Nitu Choudhary, Version 1.0 (Bates Nos. YAHOO001 – YAHOO085); photo image of Plaintiff's received text message (dated January 7, 2013); Deposition of Nitu Choudhary (dated September 4, 2013); Mobile Marketing Association, U.S. Consumer Best Practices for Messaging, Version 7.0 (dated October 16, 2012); Mobile Marketing Association, Global Code of Conduct (dated July 15, 2008); the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA") and regulations promulgated thereunder; the FCC's Report and Order in the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 dated October 16th, 1992; the FCC's Report and Order in the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 dated January 4th, 2008; the Appeal from the United States District Court for the Northern District of California, No. 07-16356, D.C. No. CV-06-02893-CW Opinion, filed June 19th, 2009; the FCC's Report and Order in the Matter of Rules and Regulations Implementing the Telephone Consumer

Kazerouni Law Group, APC
Santa Ana, California

Protection Act of 1991 dated February 15th, 2012; and the FCC's Declaratory Ruling in the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, SoundBite Communications, Inc. Petition for Expedited Declaratory Ruling dated November 29, 2012.

4.  I have over 28 years of experience in telecommunications network and system architecture, engineering, design and technology. I am an expert in the fields of both wireline and wireless telecommunications networking technology. A copy of my *curriculum vitae* is attached to this Declaration. I have been retained as a testifying or consulting expert in 59 cases regarding cellular telecommunications technology, including 40 cases regarding Short Message Service ("SMS") technology and 32 cases regarding the TCPA and associated regulations. In addition, I have been retained as an expert by both plaintiffs and defendants in cases regarding the TCPA.

5.  I have taught many classes and seminars on both wireline and wireless telecommunication network technologies and have been a panelist and speaker at numerous conferences at the Institute of Electrical and Electronics Engineers ("IEEE"), the Personal Communication Society ("PCS"), and the Cellular Telecommunications and Internet Association ("CTIA") as an expert in telecommunication networks. I spent seven years developing standards within the American National Standards Institute's subsidiary organization, the Telecommunications Industry Association ("TIA"), providing technical contributions and authoring and editing telecommunications proposed standards documents. Most notably, I authored and oversaw the standardization of Interim Standard 93, providing interconnection technology between wireline and wireless networks, which is a fully accredited national standard of the American National Standards Institute ("ANSI"). I am

Kazerouni Law Group, APC
Santa Ana, California

Kazerouni Law Group, APC
Santa Ana, California

1  the co-author of the McGraw-Hill books "Mobile Telecommunications Networking with

2  IS-41," and "Wireless Telecommunications Networking with ANSI-41, 2nd edition"

3  published in 1997 and 2001, respectively. These books have sold several thousand copies

4  and were required reading for wireless engineers at AT&T Wireless and Motorola for

5  several years. The latter book has also been relied upon and cited numerous times as a

6  reference for various patents in the telecommunications industry. I have been issued 12

7  patents myself on telecommunications networking technology and currently have seven

8  additional published patents pending. I have also authored several articles on

9  telecommunications technology and have been quoted numerous times in industry trade

10 publications. I have consulted for and been employed by many wireline and wireless

11 telecommunications companies including McCaw Cellular, AirTouch, AT&T Wireless,

12 AT&T Mobility, Lucent, Nokia, Ericsson, Nextwave, MCI, Sprint and other

13 telecommunications technology vendors and service providers. I was also nominated in

14 2006 for a National Television Arts Emmy Award for Outstanding Achievement in

15 Advanced Media Technology for unique wireless content distribution technology I

16 designed while employed at Entriq, Inc. In addition, in 2002, I was co-founder of m-Qube,

17 Inc., one of the first text message based mobile marketing companies in N. America. m-

18 Qube founded and established the Mobile Marketing Association (see

19 http://www.mmaglobal.com) which subsequently established the technology and

20 methodology for the use of text message based short codes within N. America.

21 6.  I have been issued four patents on SMS technology, including the invention of short code

22 technology, and my books have been cited in four additional issued patents on SMS

23 technology. Still more detail, as well as details of publications that I have authored or co-

-4-

authored within at least the past 10 years, are provided in my attached *curriculum vitae* (a true and correct copy of which is attached hereto as Exhibit F) along with a list of cases where I served as a testifying or consulting expert and my standard rate sheet. I am being compensated at the rate of $400 per hour for my study, analysis and testimony in this case.

## INTRODUCTION

7. The TCPA prohibits unsolicited voice and text calls to cellular telephone numbers using an "automatic telephone dialing system" ("ATDS"), which the statute defines as "equipment which has the capacity – (i) to store or produce telephone numbers to be called, using a random or sequential number generator; and (ii) to dial such numbers." Additionally, it is my understanding that the Federal Communications Commission ("FCC") has issued further regulations that also define an ATDS as including the capacity to dial telephone numbers from a provided list or database of telephone numbers without human intervention.

8. Based on my review of the relevant documents and the facts described above, it is my expert opinion that the text messages sent to the Plaintiff were sent using an ATDS as defined within the TCPA. Furthermore, it is my opinion that the Plaintiff not expressly or knowingly consent to receive such text messages from Yahoo!. I base this opinion on my knowledge, experience, expertise, training and on the evidence I have reviewed.

## BACKGROUND

9. The use of Short Message Service, more commonly known as "text messaging" in the U.S., has become ever-present. According to the Cellular Telecommunications and Internet Association ("CTIA"), as of December, 2012 there were 326.4 million cellular telephone subscriptions in the U.S. and approximately 2.19 trillion text messages sent anually.[1]

-5-

Kazerouni Law Group, APC
Santa Ana, California

**Kazerouni Law Group, APC**
Santa Ana, California

10. SMS is defined as a communications system and method designed to enable an individual cellular telephone subscriber to send, or originate, a short text message communication (typically no more than 160 characters) from his or her cellular telephone to another individual subscriber's cellular telephone that is the intended destination of the message, i.e., the message recipient. SMS text messages are sent individually from one subscriber to another using a cellular telephone number as the destination address of the message. The message sender's cellular telephone number is preserved as part of the message at the destination cellular telephone where the message is received so that the message recipient knows the cellular telephone number of the message sender.

11. Over the past several years many companies have emerged that provide what is known as value-added text messaging services using SMS technology. These companies are technically referred to as Value Added Service Providers ("VASPs") and many of them are external entities to the cellular network operators. These VASPs provide a variety of text messaging services (i.e., SMS) that are not strictly peer-to-peer in the sense of subscriber-to-subscriber manual communications; rather, they are companies that use automated computer equipment to send and receive text messages using SMS to and from individual cellular telephone subscribers. Based on my review of the materials in this case, Yahoo! performs as a VASP when providing the "PC2SMS" text message service to it's Yahoo! Messenger application users.

12. VASPs are typically in the business of creating and operating text message-based applications in order to develop and maintain some individualized communication with cellular telephone subscribers for commercial purposes. The automated computer

---

[1]See http://www.ctia.org/advocacy/research/index.cfm/aid/10323.

DECLARATION OF RANDALL A. SNYDER IN SUPPORT OF PLAINTIFF'S OPP. TO DEF.'S MTN. FOR SUMMARY JUDGMENT; CASE NO.: 3:13-CV-00041-GPC-WVG

Kazerouni Law Group, APC
Santa Ana, California

equipment that these VASPs employ is used for a variety of text messaging applications, marketing campaigns and dialogs to communicate with cellular subscribers. Common applications are voting (the most popular example being the text message voting used to vote for contestants on the American Idol television program) as well as receiving news alerts, informative notifications, coupons and sports scores where short messages are sent to cellular subscribers on a regular basis.

13. Moreover, these VASPs employ equipment that has the ability to send any number of text messages to cellular telephone subscribers as well as receive individual text messages from those subscribers. Messages sent from the VASP to a cellular subscriber are termed "mobile-terminated" ("MT") and messages sent from a cellular subscriber to a VASP are termed "mobile-originated" ("MO").

14. VASPs connect to the cellular carrier networks using internet-based connections and communications protocols. The primary protocol used is known as the Short Message Peer-to-Peer ("SMPP") protocol. SMPP is an internet-based communications protocol specifically designed for communications between a VASP and a cellular network's Short Message Service Center ("SMSC"). SMSCs are network entities that are maintained and controlled within the cellular carriers' networks and are the store and forward repositories for text messages to be both delivered to and sent from mobile subscribers.

15. VASPs' connections to the cellular network operators are internet connections and typically use a special number as the address by which cellular text messages are sent and received in order to communicate with cellular subscribers. All messages sent to a particular subscriber are delivered to that subscriber's "home" SMSC within the subscriber's home cellular network. Since VASPs are not mobile subscribers, they are not

identified by a mobile telephone number; rather, VASPs use a special number as an originating address for short text messages sent to mobile subscribers. In most cases, this number is known as a "short code." A short code is a special and unique 5- or 6-digit number that is obtained from an independent agency, Neustar, Inc., that manages and assigns these number resources in the U.S. on behalf of the cellular network operators. Individual short code numbers are leased by the VASPs to run automatic mobile text messaging applications. These numbers are provisioned (i.e., programmatically stored) by the cellular network operators so that MO messages can be properly sent from cellular subscribers to the correct VASP platform applications. In some cases, VASPs agree to a special numeric address that acts just like a short code, but is not a number resource maintained independently by Neustar. This is especially true of VASPs providing automated text messaging applications prior to 2004, at which time Neustar became the short code administrator.

16. The special numeric address value (short code or otherwise) is a virtual number and when provisioned (i.e., programmatically stored) in the cellular networks, must be associated with a computing platform identified by an internet protocol ("IP") address. In this way, MT text messages can be sent from a particular VASP, identified by a particular IP address, to particular cellular networks for delivery to cellular telephone subscribers. The cellular subscribers see the associated special numeric address as the originating address of the message. Conversely, MO text messages can be sent from a particular cellular subscriber to a VASP, using this special numeric address as the destination address of the message. The cellular networks subsequently forward those text messages to the VASP using the IP address associated with the special numeric address.

Kazerouni Law Group, APC
Santa Ana, California

**OPT-IN AND CONSENT**

17. "Opting-in" is a term that describes a method by which a cellular subscriber explicitly and expressly provides individual consent to inform a VASP that they are willing to receive text messages from the VASP for a specific text message application or promotion. Generally, consent is not broadly given for multiple commercial text message applications nor is it given in some "open-ended" fashion (i.e., without limitation) such that a cellular subscriber "opts-in" to receive any and all marketing or promotional text messages.

18. There are two reasons why express and formal "opt-in" techniques are used for automated commercial text messaging applications: (i) to enable cellular telephone subscribers to reliably provide knowing, voluntary, clear, unmistakable, explicit and express consent for a particular commercial text messaging program; and (ii) to inform the VASP that they are willing to incur appropriate text messaging charges for that application program.

19. The "opt-in" method requiring a mobile-originated text message to be sent by a cellular subscriber as a response to some "call to action" is a very reliable means for the VASP to obtain express and knowing consent to send application text messages to a cellular subscriber. This call to action requires that consumers respond by executing the initial cellular communication first so they can unmistakably and voluntarily provide express consent. Using this method, cellular subscribers must use their own cellular telephones to "opt-in" to a given text message application and the "opt-in" text message automatically contains the cellular telephone number of the cellular subscriber. This provides a very reliable express means for the VASP to ensure that the cellular subscriber "opting-in" is, in fact, the authorized cellular subscriber who wishes to receive text messages for that application.

Kazerouni Law Group, APC
Santa Ana, California

20. Every time a cellular subscriber "opts-in," or in this case is previously automatically "opted-in" as a default, to any type of text messaging program, the VASP records and stores the cellular subscribers' telephone numbers in a database or electronic list. The phone numbers are derived from incoming MO text messages received by the VASP or from information entered into an Internet application. The cellular telephone numbers need to be stored by the VASP for a given application for a variety of reasons. The application may be based primarily on MT messages once a subscriber has consented, such as sending information alerts, or the application may be based on an ongoing dialog between the VASP and the cellular subscriber such as a series of trivia questions and responses.

21. Yahoo! is a company that provides mobile text messaging services to its Yahoo! Messenger users. Based upon my knowledge, experience, expertise, training and the materials reviewed, Yahoo! is a Value Added Service Provider ("VASP") that operates an automated computer equipment system providing SMS-based applications that enable text message communications between those applications that are run on the system and cellular telephone subscribers. The "PC2SMS" application that Yahoo! developed and maintains is used to form a commercial relationship with cellular subscribers and to use the cellular networks and text messaging technology to form that relationship.

## THE MOBILE MARKETING ASSOCIATION ("MMA")

22. The MMA is a global non-profit trade organization that issues codes of conduct and best practices for all companies engaged in mobile marketing and mobile commercial activities. As part of their function, they provide industry guidelines for commercial text messaging applications and programs. The MMA is the global authoritative organization providing best practices, guidelines, rules and instructions for all companies involved in

-10-

Kazerouni Law Group, APC
Santa Ana, California

Kazerouni Law Group, APC
Santa Ana, California

communicating with cellular telephone subscribers using SMS-based text messaging technology. And, in fact, Yahoo! is a well-known member of the MMA and is clearly aware of the MMA's best practices, guidelines, rules and instructions.[2]

23. According to the MMA's Global Code of Conduct:

> **"Mobile Marketers ask for and obtain consent by obtaining an explicit opt-in from the user for all mobile messaging programs. This can be accomplished via an SMS or MMS opt-in process, a voice response, website registration, other MMA recognized methods or other legitimate methods.**
>
> **"Mobile Marketers must implement consent (opt-in) for a specific messaging program. Consent is not carried into other programs unless the user has consented to such communications either 1) when they consented to the initial program or 2) upon the commencement of a subsequent messaging program."[3]**

24. Furthermore, according to the MMA's U.S. Consumer Best Practices:

> **"At all times, programs must be in accordance with applicable federal and state laws, rules and regulations."[4]**
>
> **"Content providers must obtain opt-in approval from subscribers before sending them any SMS or MMS messages or other content from a short code."[5]**
>
> **"When opt-in to a recurring program occurs via the web or other non-mobile point of origination, the content provider must obtain verification that the subscriber is in possession of the handset being opted-in to the service.**
>
> **"For recurring standard rate programs, subscribers should indicate their willingness to participate in a program and receive messages from the program as follows:**

---

[2] See http://www.mmaglobal.com/member-center/members.

[3] See http://www.mmaglobal.com/bestpractice, Code of Conduct for Mobile Marketing, p. 1.

[4] See http://www.mmaglobal.com/bestpractice, U.S. Consumer Best Practices, p. 7.

[5] See http://www.mmaglobal.com/bestpractice, U.S. Consumer Best Practices, p. 8.

**1. Subscriber initiates opt-in to a recurring Standard Rate Program by responding to a call to action (CTA):**

    **i.)  Subscriber may send a Mobile Originated (MO) message from their handset to the short code.**

    **ii.)  Subscriber may initiate opt-in from a web interface.**

    **iii.) Subscriber may initiate opt-in from a WAP interface.**

    **iv.) Subscriber may initiate opt-in from an IVR system."[6]**

25. In addition, the MMA provides clear best practices and instructions to enable cellular subscribers to "opt-out" of receiving any text messages from an automated application program:

    **"After opt-in to a recurring program, a confirmation Mobile Terminating (MT) message must be sent to the subscriber containing, at minimum, the following information:**

    **a) Service description**

    **b) Program Sponsor**

    **c) Additional carrier costs (e.g. Msg&Data Rates May Apply)**

    **d) Frequency of messaging**

    **e) Customer support information (HELP)**

    **f) Opt-Out information (STOP)"[7]**

26. "Opting-out" is a term that describes a method by which a cellular subscriber explicitly and expressly revokes individual consent to inform a VASP that they are no longer willing to receive text messages from the VASP for a specific text message application.

---

[6] See http://www.mmaglobal.com/bestpractice, U.S. Consumer Best Practices, p. 8-9.

[7] See http://www.mmaglobal.com/bestpractice, U.S. Consumer Best Practices, p. 9.

Kazerouni Law Group, APC
Santa Ana, California

Kazerouni Law Group, APC
Santa Ana, California

27. For "opting-out," the MMA mandates the following instructions to VASPs:

> **"Content providers must offer subscribers the opportunity to cancel the service at any time. The following rules govern program opt-out:**
>
> **"A subscriber must be able to stop participating and receiving messages from any program by sending STOP to the short code used for that program.**
>
> **"END, CANCEL, UNSUBSCRIBE or QUIT should also be opt-out key words for all programs; however, content providers should feature the word STOP in their advertising and messaging. Messaging content providers must process a stop message from a subscriber regardless of the keyword STOP's case sensitivity."[8]**

## FACTS REGARDING THE PLAINTIFF AND CONSENT

28. On Monday, January 7, 2013, the Plaintiff received an unsolicited text message call on his cellular telephone from the numeric code "92466501" (a true and correct copy of which is attached hereto as Exhibit A). The content of the text message read:

> **"A Yahoo! User has sent you a message. Reply to that SMS to respond. Reply INFO to this SMS for help or go to y.ahoo.it/imsms."**

29. The Plaintiff had apparently received this text message as a result of the "PC2SMS" programmatic feature of the Yahoo! Messenger application program. The "PC2SMS" program sends this text message to cellular subscribers prior to sending them Yahoo! Messenger instant messages.

30. According to Ms. Nitu Choudhary, Software Engineer for Yahoo!, in her deposition (see Exhibit B, "Choudhary Dep."), "…yes, our records have shown that we have – that he did on January received a message from Yahoo! [*sic*]." (Choudhary Dep. 75:13-21.)

---

[8]See http://www.mmaglobal.com/bestpractice, U.S. Consumer Best Practices, p. 10.

DECLARATION OF RANDALL A. SNYDER IN SUPPORT OF PLAINTIFF'S OPP. TO DEF.'S MTN. FOR SUMMARY JUDGMENT; CASE NO.: 3:13-CV-00041-GPC-WVG

31. Yahoo! had evidently obtained the Plaintiff's cellular telephone number, which was used to send him the text message, by offering the "PC2SMS" programmatic feature to Yahoo! Messenger users.

32. According to Ms. Choudhary, in her Declaration (see Exhibit C, "Choudhary Dec."), "The PC to SMS service is configured to automatically convert instant messages into SMS messages so that they will be received on mobile devices." (Choudhary Dec. 1:20:21.)

33. When a Yahoo! Messenger user wants to send an instant message ("IM") to some intended message recipient, and uses the Yahoo! Messenger for SMS application from a desktop, laptop or tablet computer, the user has the ability to send the IM via SMS. The Yahoo! Messenger user can choose a message recipient from a list of the user's contacts (see Exhibit D, Bates No. YAHOO075) or can define an *ad hoc* message recipient that is not in the contact list (see Exhibit D, Bates No. YAHOO077). If the Yahoo! Messenger user chooses a message recipient from the contacts list, a cellular telephone number already associated with the contact can be chosen, or a new cellular telephone number can be entered. Once the cellular telephone number is chosen or entered, the Yahoo! Messenger user can then type in an IM and click on the "Send" button. Similarly, if the Yahoo! Messenger user defines an *ad hoc* message recipient that is not in the contact list, the user can enter a cellular telephone number. The Yahoo! Messenger user can then type in an IM and click on the "Send" button. The Yahoo! Messenger for SMS application then sends the message to the cellular subscriber, identified by the cellular telephone number, as an SMS-based text message using the "PC2SMS" program feature.

**Kazerouni Law Group, APC**
Santa Ana, California

34. If the intended recipient of the IM has not been sent a message before from the Yahoo! Messenger for SMS application, he or she automatically receives an unsolicited notification SMS-based text message.

35. According to Ms. Choudhary, "Basically, the Yahoo! user, when he tries to send a message to the mobile phone, that message gets transmitted and when the PC2SMS server determines this is the first time the mobile phone is receiving a message, then it sends out a message to the user saying that the Yahoo! user has sent you a message." (Choudhary Dep. 47:22-48:4.)

36. Furthermore, Ms. Choudhary states, "It is like a Yahoo! user sends a message and the Yahoo! PC2SMS server determines that the mobile phone has not received a message, then it basically sends out – it informs the user that a Yahoo! user has sent you a message and reply to that SMS to respond." (Choudhary Dep. 49:3-12.) Moreover, Ms. Choudhary admitted that every intended message recipient who has not previously received an IM from the PC2SMS system receives this unsolicited notification message. (Choudhary Dep. 52:5-25.) Moreover, Ms. Choudhary admitted that the notification message the Plaintiff received in this case is the same message received by all intended message recipients who have not previously received an IM from the PC2SMS system. (Choudhary Dep. 53:3-14.)

37. Ms. Choudhary also admitted in her deposition that these notification messages are not sent out manually (Choudhary Dep. 55:15-18). And, when Ms. Choudhary was asked if the messages were sent out in an automated fashion, she stated, "The server runs by itself, so I'm not sure what you mean.  So the – so the server runs and it sends out messages." (Choudhary Dep. 55:19-22.) In addition, Ms. Choudhary stated, "Yeah, computer [*sic*] sends a message. There is no human to press a button." (Choudhary Dep. 57:8-17.) Also,

Kazerouni Law Group, APC
Santa Ana, California

Kazerouni Law Group, APC
Santa Ana, California

when asked if the overall process by which a Yahoo! Messenger user sends an IM using the Yahoo! Messenger for SMS application is all computerized and does not require human intervention, Ms. Choudhary simply answered, "Yes." (Choudhary Dep. 58:13-15.)

38. Furthermore, when Ms. Choudhary was asked in her deposition who sent the first communication to the Plaintiff, she answered, "The Yahoo! user was trying to send a message to Mr. Sherman – sent out the message." (Choudhary Dep. 81:14-20.) "Yahoo! then sent out the two messages to Mr. Sherman's phone." (Choudhary Dep. 81:21-24.) The two messages refers to the initial unsolicited notification text message along with the unsolicited text message containing the IM from the Yahoo! Messenger user.

39. In order for the "PC2SMS" system to determine whether an IM had ever been previously sent to a particular intended message recipient, identified only by a cellular telephone number, and whether to send that recipient an initial notification message, the system must **store** cellular telephone numbers to be called. In Ms. Choudhary's deposition, when asked if the PC2SMS servers keep cellular telephone numbers and if they are stored on Yahoo!'s servers, Ms. Choudhary simply replied, "Yes." (Choudhary Dep. 59:15-21.) In fact, in order for the "PC2SMS" system to send automated text messages to cellular telephone subscribers, it needs to check the cellular telephone numbers in a database as Ms. Choudhary states, "The communication is from the PC2SMS server to the database [of cellular telephone numbers]." (Choudhary Dep. 60:3-6.) Moreover, Ms. Choudhary states,

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

-16-

███████████████████████████████████ (Choudhary Dep. 64:14-21.) In addition, when asked if the Plaintiff's cellular telephone was stored in the list right now, Ms. Choudhary answered, "Mr. Sherman's number is in the database." (Choudhary Dep. 96:10-12.)

40. In order for an intended message recipient to "opt-out" of receiving text messages, the cellular subscriber is instructed, in the initial unsolicited notification message, to reply to the message with an MO text message containing the content "help" in the body of the message. According to Ms. Choudhary, "…when you send back, the system is going to send out all of the commands that the user can use for the service, or if you go to this link, the user can find out how he can use the service, which includes opt-out." (Choudhary Dep. 83:11-22.)

41. Thus, in order to "opt-out" from continuing to receive unsolicited text messages, the cellular subscriber is required to engage in a complex text message dialog with Yahoo!'s system, resulting in the subscriber sending and receiving several more text messages. Alternatively, the subscriber can click on the link contained in the initial notification text message, "y.ahoo.it/imsms," launch a cellular data session, scan the mobile website for barely readable instructions how to "opt-out" and choose to "opt-out" on the mobile website (see Exhibit D, Bates No. YAHOO085). In either case, this "opt-out" mechanism is a clear violation of the MMA rules and results in additional unwanted text message charges or cellular data charges.

42. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

DECLARATION OF RANDALL A. SNYDER IN SUPPORT OF PLAINTIFF'S OPP. TO DEF.'S MTN. FOR SUMMARY JUDGMENT; CASE NO.: 3:13-CV-00041-GPC-WVG

████████████████████████████████████████████████████████

██████████████████████████████████████████████ (Choudhary

Dep. 87:11-19.)

43. Therefore, besides having to enter into a complex text message dialog, or enter into a cellular data session, the intended message recipient has the unaware option of incurring the fees for five unsolicited MT text messages before Yahoo! ceases sending these messages.

44. Ms. Choudhary characterizes the initial notification text message as a "confirmatory" message. (Choudhary Dec. 2:13-23.) Based on the plain and ordinary meaning of the word "confirmatory" and also according to the MMA, the initial notification text message is assuredly not a "confirmatory" message. Confirmatory MT text messages are sent from a VASP's automated text messaging system in response to an MO text message sent to it by a cellular subscriber. In this case, the Plaintiff never communicated at all with Yahoo! before receiving the initial notification text message.

45. Based on Ms. Choudhary's own testimony, as a Software Engineer for Yahoo!, and my own detailed analysis of the design of the Yahoo! Messenger application program, it is clear and evident that the cellular telephone numbers of intended recipients of instant messages sent from the Yahoo! Messenger application are automatically "opted-in" to receive text messages from the application. ████████████████████

████████████████████████

46. ████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

Kazerouni Law Group, APC
Santa Ana, California

47. Cellular telephone numbers that have been deactivated and relinquished by cellular telephone subscribers and reassigned by a cellular telephone carrier to other cellular telephone subscribers are known as "recycled" numbers.

48. The Yahoo! Messenger for SMS application developed and used by Yahoo! treats the new owner of a recycled cellular telephone number the same as the previous owner of the number. Users of recycled cellular telephone numbers incur the cost to receive erroneous text messages and are provided with no explicit means to contact Yahoo! to make them stop. In fact, the Yahoo! Messenger for SMS application provides no way for a message recipient to "opt-in" or consent to receive cellular text messages, whether they are the intended recipient or the new user of a cellular telephone number that is not the intended recipient. And, the Yahoo! Messenger for SMS application provides no means to confirm that MT text messages are, in fact, being sent to someone who has ever had any contact or any relationship with Yahoo!

-19-

**Kazerouni Law Group, APC**
Santa Ana, California

## FACTS REGARDING THE TCPA

49. The TCPA allows autodialed calls… …if the called party expressly consents to their use." (see *FCC's Report and Order in the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991* dated October 16[th], 1992).

50. The TCPA prohibits unsolicited voice and text calls to cellular telephone numbers using an "automatic telephone dialing system" ("ATDS"), which the statute defines as "equipment which has the capacity – (i) to store or produce telephone numbers to be called, using a random or sequential number generator; and (ii) to dial such numbers."

51. The FCC has held that prohibitions under the TCPA apply equally to both voice calls and SMS text message calls to cellular telephone numbers (see *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278,* February 15th, 2012).

52. Furthermore, the FCC has held that prohibitions under the TCPA apply to stored lists of telephone numbers as well as random or sequentially generated numbers. In fact, The United States Court for the Ninth Circuit quoted my name and expert report in the case of *Satterfield v. Simon & Schuster, Inc.* that "[t]he use of stored numbers, randomly generated numbers or sequentially generated numbers used to automatically originate calls is a technical difference without a perceived distinction…" (see *Satterfield v. Simon & Schuster, Inc. No. 07-16356, D.C. No. CV-06-02893-CW Opinion,* June 19th, 2009, p. 7338). Moreover, the FCC has held that prohibitions under the TCPA apply to lists of telephone numbers as well as random or sequentially generated numbers (see *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278,* January 4th, 2008).

Kazerouni Law Group, APC
Santa Ana, California

**DEFENDANTS' ASSERTIONS**

53. According to the Defendants, the initial unsolicited notification text message sent to the Plaintiff was a "confirmatory" text message. In fact, this message confirms nothing; it is simply a notification message sent to a cellular subscriber who may be the intended recipient of an instant message. Based on the plain and ordinary meaning of the word "confirmatory" and also according to the MMA, the initial notification text message is definitely not a "confirmatory" message. Confirmatory MT text messages are sent from a VASP's automated text messaging system either in response to an MO text message sent to it by a cellular subscriber or in response to the cellular subscriber "opting-in" by some other means. In this case, the Plaintiff never communicated at all with Yahoo! before receiving the initial notification text message, so there was no action taken by the Plaintiff needing a confirmation from Yahoo!

54. According to the Defendants, "The PC to SMS service is configured to automatically convert instant messages into SMS messages so that they will be received on mobile devices." I agree with the Defendants and, in fact, as previously described, Yahoo!'s "PC2SMS" system is designed to take an instant message created on a desktop, laptop or tablet computer, obtain a cellular telephone number which may or may not be the number of the intended recipient of the message, convert that instant message into an SMS-based text message, store the obtained cellular telephone number in a mobile database, and send an MT text message to the stored cellular telephone number all in an automated fashion and without human intervention.

Kazerouni Law Group, APC
Santa Ana, California

## CONCLUSIONS

55. Yahoo! is a member of the Mobile Marketing Association ("MMA"), the global organization which issues best practices, guidelines, rules and instructions for all companies involved in communicating with cellular telephone subscribers using SMS-based text messaging technology. As such, they are well aware of the MMA's best practices, guidelines, rules and instructions for all companies involved in communicating with cellular telephone subscribers using SMS-based text messaging technology.

56. On January 7, 2013, the Plaintiff received an unexpected and unsolicited text message call on his cellular telephone from the numeric code "92466501."

57. The Plaintiff received this text message as a result of someone entering his cellular telephone number into the Yahoo! Messenger application.

58. Yahoo! obtained the Plaintiff's cellular telephone number from the Yahoo! Messenger application program.

59. The unsolicited initial notification message received by the Plaintiff indicated that it came from Yahoo! with no indication of who the original message sender was.

60. The Plaintiff at no time "opted-in" or in any way provided consent to receive any text messages at all from Yahoo!, as required by both the MMA and the TCPA.

61. There was no text in the unsolicited notification message received by the Plaintiff that indicated how, or even if, the Plaintiff could "opt-out" of receiving any additional text messages on his cellular phone, as required by the MMA. In fact, the Plaintiff could not "opt-out" unless: (i) he participated in a text message dialog to figure out how to "opt-out"; (ii) launched a cellular data session and perused a mobile website to learn how to "opt-out"; or (iii) ███████████████████████████████████████████████████

Kazerouni Law Group, APC
Santa Ana, California

██████ all of which would have caused the Plaintiff to incur additional charges for an application for which he provided absolutely no consent.

62. Yahoo! stores cellular telephone number before sending initial unsolicited notification text messages. And, Yahoo! continues to store cellular telephone numbers in order to send additional text messages. Yahoo! considers cellular subscribers to be automatically "opted-in" ████████████████████████████████████████████████████████ ████████████████████████████ Therefore, according to Yahoo!, a cellular subscriber is sent five unsolicited text messages before they cease.

63. Yahoo! did not at any time check whether the cellular telephone number used to send text messages to the Plaintiff was, in fact, the cellular telephone number of the intended message recipient. Cellular telephone numbers can be recycled and multiple cellular subscribers may use a particular cellular telephone number over time. Furthermore, whether the cellular telephone number was that of the intended message recipient or not, Yahoo! obtained no consent to send any text messages to cellular subscribers.

64. The MMA clearly states that mobile text message programs must include an "opt-in" mechanism (i.e., for express and knowing consent) and an "opt-out" mechanism by enabling a mobile text message recipient to simply reply "STOP" to a received mobile text message. The unsolicited text messages sent to cellular subscribers via the Yahoo! Messenger for SMS application contain no such express "opt-out" mechanism.

65. The MMA clearly states that all text message programs must adhere to all state and federal laws, rules and regulations.

Kazerouni Law Group, APC
Santa Ana, California

66. The TCPA allows autodialed calls if the called party expressly and knowingly consents to their use. This means that the called party must consciously, intentionally or deliberately provide their phone numbers in order to expressly consent to being called by an ATDS.

67. The TCPA prohibits unsolicited voice and text calls to cellular telephone numbers using an "automatic telephone dialing system" ("ATDS"), defined as "equipment which has the capacity – (i) to store or produce telephone numbers to be called, using a random or sequential number generator; and (ii) to dial such numbers."

68. The FCC has held that prohibitions under the TCPA apply equally to both voice calls and SMS text message calls to cellular telephone numbers.

69. The FCC has held that prohibitions under the TCPA apply to lists of telephone numbers as well as random or sequentially generated numbers.

70. Yahoo! automatically obtains subscribers' cellular telephone numbers from Yahoo! Messenger users.

71. Yahoo! stores these subscriber' cellular telephone numbers in a list for subsequent use as the destination address to send cellular subscribers additional SMS-based text messages.

72. Yahoo! creates a text message template and automatically applies both the numeric code "92466501" as the origination address and each cellular telephone number as the destination address (from its stored list of telephone numbers) to that message template to assemble each complete text message in an automated fashion.

73. Yahoo! automatically sends these automatically created text messages to cellular subscribers and without human intervention.

74. Based on Ms. Choudhary's testimony, my own analysis of the Yahoo! Messenger for SMS application and the definition of an ATDS within the TCPA and accompanying regulations,

-24-

I conclude that the equipment used by the Defendants has the capacity to store or produce cellular telephone numbers to be called, using a random or sequential number generator, or from a list of telephone numbers.

75. Based on Ms. Choudhary's testimony, my own analysis of the Yahoo! Messenger for SMS application and the definition of an ATDS within the TCPA and accompanying regulations, I conclude that the equipment used by the Defendants did, in fact, store a list of cellular telephone numbers to be called.

76. Based on Ms. Choudhary's testimony, my own analysis of the Yahoo! Messenger for SMS application and the definition of an ATDS within the TCPA and accompanying regulations, I conclude that the equipment used by the Defendants has the capacity to dial cellular telephone numbers (i.e., send SMS-based text messages) without human intervention.

77. Based on Ms. Choudhary's testimony, my own analysis of the Yahoo! Messenger for SMS application and the definition of an ATDS within the TCPA and accompanying regulations, I conclude that the equipment used by the Defendants did, in fact, dial cellular telephone numbers (i.e., send SMS-based text messages) without human intervention.

78. Based on Ms. Choudhary's testimony, my own analysis of the Yahoo! Messenger for SMS application and the definition of an ATDS within the TCPA and accompanying regulations, I therefore conclude that the equipment used by the Defendants fulfills the definition of an ATDS within the TCPA.

79. Therefore, I conclude that the equipment used by the Defendants was used to transmit unsolicited and unwanted text messages to cellular subscribers without prior express or knowing consent.

Kazerouni Law Group, APC
Santa Ana, California

## SUMMARY OF OPINIONS

80. I can confidently and definitively state that Yahoo! operates and maintains an Automatic Telephone dialing System ("ATDS") as defined in the TCPA and accompanying regulations. Yahoo! is a VASP providing automated mobile text message application services using numeric addresses that are specially provisioned in the cellular operators' networks. As such, Yahoo! must use computer equipment to provide those services. Based on Ms. Choudhary's testimony and my analysis of the Yahoo! Messenger for SMS application, it is indisputable that automated computer equipment was used to send unsolicited mobile text messages to cellular telephone subscribers.

81. Moreover, in order for Yahoo! to provide the Yahoo! Messenger for SMS application, it must store cellular telephone numbers to communicate with cellular telephone subscribers to determine if an initial notification message should be sent. Yahoo! obtains cellular telephone numbers from Yahoo! Messenger users and stores these numbers in a database to be called. Therefore, Yahoo!'s equipment clearly has the capacity to store telephone numbers to be called. And, in fact, not only does it have this capacity, it actually performs this function.

82. It is plainly apparent, that Yahoo! provides no means for cellular subscribers to "opt-in" or consent to receive text messages for the Yahoo! Messenger application program. It is also plainly apparent that the Yahoo! Messenger application sends MT text messages to cellular subscribers without their consent.

83. It is my expert opinion, based on my knowledge, experience, expertise, training and my review of the relevant documents and the facts described above, that the Defendants employed equipment which has the capacity to store or produce cellular telephone numbers

-26-

Kazerouni Law Group, APC
Santa Ana, California

to be called, using a random or sequential number generator or from a list of telephone numbers; the Defendants did, in fact, use such equipment; the Defendants employed this equipment which has the capacity to dial cellular telephone numbers without human intervention; the Defendants did, in fact, dial cellular telephone numbers without human intervention; and the equipment used by the Defendants was used to transmit unsolicited cellular text messages to cellular subscribers without prior express or knowing consent.

84. My opinions in this declaration are based upon extensive experience in the telecommunications industry, a detailed understanding of telecommunications systems, a detailed understanding of Short Message Service ("SMS") technology, and a detailed understanding of mobile marketing employing SMS technology. I hereby reserve the right to supplement or modify my opinions detailed in this report to the extent that new information is made available through discovery or other means.

I declare that the foregoing is true and correct subject to the laws of perjury of the United States.

Executed in Las Vegas, Nevada, on this 13th day of September 2013.

_Randall A. Snyder_
_____
Randall A. Snyder