1  GREENBERG TRAURIG, LLP
   IAN C. BALLON (SBN 141819)
2  Ballon@gtlaw.com
   LORI CHANG (SBN 228142)
3  ChangL@gtlaw.com
   NINA D. BOYAJIAN (SBN 246415)
4  BoyajianN@gtlaw.com
   JUSTIN A. BARTON (SBN 288194)
5  BartonJu@gtlaw.com
   1840 Century Park East, Suite 1900
6  Los Angeles, CA 90067-2121
   Tel: 310-586-7700; Fax: 310-586-7800
7
8
   Attorneys for defendant Yahoo! Inc.
9

10              UNITED STATES DISTRICT COURT

11             SOUTHERN DISTRICT OF CALIFORNIA

12

13  RAFAEL DAVID SHERMAN and          Case No. 13-CV-0041-GPC (WVG)
    SUSAN PATHMAN, Individually and
14  on Behalf of All Others Similarly
    Situated,                         **[REDACTED] DEFENDANT YAHOO!**
15                                     **INC.'S OPPOSITION TO PLAINTIFF**
                                       **SUSAN PATHMAN'S MOTION FOR**
16              Plaintiffs,            **CLASS CERTIFICATION**

17  vs.                               **ORAL ARGUMENT REQUESTED**

18
    YAHOO! INC., a Delaware Corporation,   *Filed Concurrently with Andrews*
19                                         *Declaration, Doron Declaration, Boyajian*
                                           *Declaration, Aron Expert Report, Boyd*
20              Defendant.                 *Expert Report, Request for Judicial Notice*

21
                                       Date:       June 12, 2015
22                                     Time:       1:30 p.m.
                                       Location:   Courtroom 2D
23
                                       Judge:      Hon. Gonzalo P. Curiel
24                                     Complaint Filed:   January 8, 2013

25

26

27

28

# <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ........................................................................................1

II.  STATEMENT OF FACTS .........................................................................4

    A.   Yahoo's PC2SMS Service Is A Free Messaging Service ................4

    B.   The Identity Of The Recipient Of The Welcome Message Cannot Be Ascertained From Either Yahoo's Records Or By Subpoenaing AT&T.......5

    C.   Putative Class Members Assented To One Or More Versions Of Yahoo's Terms Of Service Agreements Providing Prior Express Consent For Yahoo To Send Text Messages ...................................7

    D.   Susan Pathman Consented To Receive Text Messages From Yahoo And Voluntarily Provided Her Mobile Number To Yahoo .........................9

III. LEGAL STANDARD...............................................................................11

IV.  ARGUMENT ...........................................................................................12

    A.   Pathman Has Not Met Her Burden Of Proving That Class Membership Can Be Ascertained From Collective Evidence............................12

        1.   Yahoo's Records Cannot Identify All Users Who Were Sent A Message........................................................................12

        2.   Pathman Failed To Show That Class Members Can Be Identified By Subpoenaing AT&T ....................................15

    B.   Common Issues Do Not Predominate Because Consent and Liability Cannot Be Determined Based On Classwide Proof........................18

        1.   Yahoo Obtained "Prior Express Consent" Through Multiple Different Channels .........................................................20

            a.   Express Agreement To Terms Of Service................20

            b.   Users' Voluntarily Provision Of Cell Phone Numbers To Yahoo.................................................................22

            c.   Consent Through An Intermediary..........................24

i

2. Each Channel Of Consent Involves Numerous Factual Inquiries That Must Be Resolved On An Individual Basis To Establish Liability ........................................................................................26

C. Class Action Is Not "Superior" To Individual Prosecution Of Claims. ........28

D. Pathman Is Not An "Adequate" Or "Typical" Class Representative ............33

E. Plaintiff Has Not Met Her Burden Of Proposing A Trial Plan.....................35

V. CONCLUSION.............................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Abdeljalil v. GE Capital Corp.*,
    12 cv 02078-JAH, 2015 WL 1346850 (S.D. Cal. Mar. 26, 2015) ...............................15

*Aderhold v. Car2go N.A., LLC*,
    No. C13-489RAJ, 2014 WL 794802 (W.D. Wash. Feb. 27, 2014) ................18, 22, 24

*Agne v. Papa John's Int'l*,
    286 F.R.D. 559 (W.D. Wash. 2012) ....................................................................29

*Am. Pipe & Const. Co. v. Utah*,
    414 U.S. 538 (1974)....................................................................................3, 4, 30

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)...........................................................................................30

*Baird v. Sabre Inc.*,
    995 F. Supp. 2d 1100 (C.D. Cal. 2014) .........................................................23, 25

*Baisden v. Credit Adjustments, Inc.*,
    No. 2:13-cv-992, 2015 WL 1046186 (S.D. Ohio Mar. 10, 2015)............................25

*Barani v. Wells Fargo Bank, N.A.*,
    No. 12CV2999-GPC (KSC), 2014 WL 1389329 (S.D. Cal. Apr. 9, 2014) ...............20

*Bateman v. Am. Multi-Cinema, Inc.*,
    623 F.3d 708 (9th Cir. 2010) ............................................................................32

*Berger v. Home Depot USA, Inc.*,
    741 F.3d 1061 (9th Cir. 2014) ...........................................................................22

*Berger v. Ludwick*,
    No. C-97-0728-CAL, 2000 WL 1262646 (N.D. Cal. Aug. 17, 2000) ........................35

*Birchmeier v. Caribbean Cruise Line, Inc.*,
    No. 12 C 4069 (N.D. Ill. Mar. 20, 2015) ............................................................17

*Bodner v. Oreck Direct, LLC*,
    No. 06-4756, 2007 WL 1223777 (N.D. Cal. Apr. 25, 2007) .................................33

*Booth v. Appstack, Inc.*,
No. C13-1533JLR, 2015 WL 1466247 (W.D. Wash. Mar. 30, 2015) ........................20

*Califano v. Yamasaki*,
442 U.S. 682 (1979)........................................................................................11

*CE Design Ltd. v. King Architectural Metals, Inc.*,
637 F.3d 721 (7th Cir. 2011) ...........................................................................34

*Cellco P'ship v. Wilcrest Health Care Mgmt. Inc.*,
Civil Action No. 09-3534 (MLC), 2012 WL 1638056 (D.N.J. May 8,
2012) ..............................................................................................................31

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013).....................................................................................11

*Connelly v. Hilton Grand Vacations, Co., LLC*,
294 F.R.D. 574 (S.D. Cal. 2013) .....................................................................19

*Cottle-Banks v. Cox Commc'ns, Inc.*,
No. 10cv2133-GPC (WVG), 2013 WL 2244333 (S.D. Cal. May 21,
2013) ........................................................................................................11, 15

*Crawford v. Beachbody, LLC*,
No. 14cv1583-GPC (KSC), 2014 WL 6606563 (S.D. Cal. Nov. 5, 2014) ................21

*Edwards v. First American Corp.*,
610 F.3d 514 (2010)........................................................................................32

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ...........................................................................11

*Fine v. ConAgra Foods, Inc.*,
No. CV 10-01848 SJO, 2010 WL 3632469 (C.D. Cal. Aug. 26, 2010)......................33

*Forman v. Data Transfer, Inc.*,
164 F.R.D. 400 (E.D. Pa. 1995).......................................................................31

*G.M. Sign, Inc. v. Grp. C Commc'ns, Inc.*,
No. 08-cv-4521, 2010 WL 744262 (N.D. Ill. Feb. 25, 2010)....................................29

*Galvan v. KDI Distrib.*,
2011 WL 5116585 (C.D. Cal. Oct. 25, 2011) .............................................................35

*Gannon v. Network Tel. Servs., Inc.*,
No. CV 12–9777–RGK, 2013 WL 2450199 (C.D. Cal. June 5, 2013)......................13

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  903 F.2d 176 (2d Cir.1990) ....................................................................35

*Gen. Tel. Co. of the Sw. v. Falcon*,
  457 U.S. 147 (1982)...............................................................................33

*Gene & Gene LLC v. BioPay LLC*,
  541 F.3d 318 (5th Cir. 2008) ...........................................................19, 20

*Hanlon v. Chrysler Corp*,
  150 F.3d 1011 (9th Cir. 1998) ................................................................33

*Hanon v. Dataprods. Corp.*,
  976 F.2d 497 (9th Cir. 1992) ..................................................................34

*Hofstetter v. Chase Home Fin., LLC*,
  No. C 10-01313 WHA, 2011 WL 1225900 (N.D. Cal. Mar. 31, 2011)......................15

*Hudson v. Sharp Healthcare*,
  13-CV-1807-MMA (NLS), 2014 WL 2892290 (S.D. Cal. June 25, 2014) ..........23, 27

*In re Farsheedi*,
  No. C 09–3888 JF, 2009 WL 4572745 (N.D. Cal. Dec. 4, 2009) ................17

*In re: Google Inc. Gmail Litig.*,
  No.: 13-MD-02430-LHK, 2014 WL 1102660 (N.D. Cal. Mar. 18, 2014) ................26

*In re Jiffy Lube Int'l, Inc. Text Spam Litig.*,
  847 F. Supp. 2d 1253 (S.D. Cal. 2012) ...................................................25

*Kline v. Coldwell, Banker & Co.*,
  508 F.2d 226 (9th Cir. 1974) ..................................................................32

*Knutson v. Schwan's Home Serv., Inc.*,
  No. 12-0964-GPC, 2013 WL 3746118 (S.D. Cal. July 15, 2013)..............12

*Kolinek v. Walgreen Co.*,
  No. 13 C 4806, 2014 WL 3056813 (N.D. Ill. July 7, 2014).......................26

*Lilly v. Jamba Juice Co.*,
  No. 13-2998, 2014 WL 4652283 (N.D. Cal. Sept. 18, 2014).....................17

*Lipscomb v. Aargon Agency, Inc.*,
  No. PWG-13-2751, 2014 WL 5782040 (D. Md. Nov. 5, 2014) ..................25

v

*Mais v. Gulf Coast Collection Bureau, Inc.*,
   768 F.3d 1110 (11th Cir. 2014) ...................................................................24

*Mevorha v Wels Fargo Home Mortg. (in re Wells Fargo Home Mortg.
   Overtime Pay Litig.)*,
   571 F.3d 953 (9th Cir. 2009) .....................................................................30

*Meyer v. Portfolio Recovery Assocs., LLC*,
   707 F.3d 1036 (9th Cir. 2012) ....................................................................20

*Mims v. Arrow Fin. Servs., LLC*,
   132 S. Ct. 740 (2012)..................................................................................31

*Murphy v. DCI Biologicals Orlando, LLC*,
   No. 6:12-cv-1459-Orl-36KRS, 2013 WL 6865772 (M.D. Fla. Dec. 31,
   2013) ...........................................................................................................23

*Negrete v. Allianz Life Ins. Co. of N. Am.*,
   238 F.R.D. 482 (C.D. Cal. 2006)................................................................15

*Nguyen v. Barnes & Noble Inc.*,
   763 F.3d 1171 (9th Cir. 2014) ....................................................................21

*Olney v. Job.Com, Inc.*,
   No. 1:12-cv-01724-LJO-SKO, 2014 WL 1747674 (E.D. Cal. May 1,
   2014) ...........................................................................................................23

*Ranwick v. Texas Gila, LLC*,
   37 F. Supp. 3d 1053 (D. Minn. 2014)..........................................................24

*Roberts v. PayPal, Inc.*,
   C 12-0622 PJH, 2013 WL 2384242 (N.D. Cal. May 30, 2013)...................23

*Robins v. Spokeo, Inc.*,
   742 F.3d 409 (9th Cir. 2014), *cert granted*, 82 U.S.L.W. 3689 (U.S. Apr.
   27, 2015) ......................................................................................................32

*Santillan v. Ashcroft*,
   No. C 04-2686 MHP, 2004 WL 2297990 (N.D. Cal. Oct. 12, 2004) ..........18

*Satterfield v. Simon & Schuster, Inc.*,
   569 F.3d 946 (9th Cir. 2009) ...............................................................21, 22

*Smith v. Microsoft Corp.*,
   297 F.R.D. 464 (S.D. Cal. 2014) ..........................................11, 13, 29, 31

*Spencer v. Beavex*,
   No. 05-CV-1501 WQH, 2006 WL 6500597 (S.D. Cal. Dec. 15, 2006) ....................15

*State Farm Mut. Auto Ins. Co. v. Campbell*,
   538 U.S. 408 (2003)...................................................................................................32

*Stern v. DoCircle, Inc.*,
   SACV 12-2005 AG (JPRx), 2014 WL 486262 (C.D. Cal. Jan. 29, 2014) ...................25

*In re Teflon Prods. Liab. Litig.*,
   254 F.R.D. 354 (S.D. Iowa 2008) .............................................................................16

*Valentino v. Carter-Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996) ....................................................................................35

*Van Patten v. Vertical Fitness Group, LLC*,
   12-cv-01614-LAB-MDD, Dkt. No. 54, 7:7-13 (S.D. Cal. Nov. 8, 2013) ...................25

*Van Patten v. Vertical Fitness Grp., LLC*,
   22 F. Supp. 3d 1069, 1078 (S.D. Cal. 2014) .............................................................23

*Wachtel v. Guardian Life Ins. Co.*,
   453 F.3d 179 (3d Cir. 2006) ......................................................................................35

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011)........................................................................................11, 15

*In re Yahoo Mail Litig.*,
   7 F. Supp. 3d 1016 (N.D. Cal. 2014) .........................................................................21

*Zinser v. Accufix Research Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001) .............................................................................30, 35

**State Cases**

*Tataryn v. Barnett*,
   No. 08FL00527 (Cal. Super. Ct. June 9, 2014) .........................................................17

**Federal Statutes**

15 U.S.C. § 7001 ................................................................................................................19

47 U.S.C. § 227 ..................................................................................................................18

47 U.S.C. § 227(a)(5)....................................................................................................18, 19

47 U.S.C. § 227(b)(3) ...........................................................................................31

**State Statutes**

California Code of Civil Procedure § 1985.3(f) ......................................................17

California Public Utilities Code § 216 ....................................................................17

California Public Utilities Code § 2891 ..................................................................17

California Public Utilities Code § 2891(a) ..............................................................17

California Public Utilities Code § 2891(a)(4) .........................................................17

**Rules**

Federal Rules of Civil Procedure, Rule 23 ......................................................*passim*

Federal Rules of Civil Procedure, Rule 23(a) ...................................................11, 33

Federal Rules of Civil Procedure, Rule 23(a)(4) .....................................................33

Federal Rules of Civil Procedure, Rule 23(b)(3) ..................................1, 2, 11, 30

Federal Rules of Civil Procedure, Rule 23(c)(1)(A) ...............................................35

**Regulations**

47 C.F.R. § 64.1200(a)(1) .....................................................................................18

47 C.F.R. § 64.1200(a)(3) .....................................................................................19

**Constitutional Provisions**

Article III, U.S. Constitution .................................................................................32

**Other Authorities**

7A CHARLES ALAN WRIGHT, ET. AL., FEDERAL PRACTICE & PROCEDURE §
    1780 (2d ed.1986) ..........................................................................................30

137 Cong. Rec. S16,204 ........................................................................................31

137 Cong. Rec. S16204-01 ....................................................................................31

137 Cong. Rec. S9840-02 ......................................................................................31

Newberg on Class Actions § 4:35 ..........................................................................29

*Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7
   FCC Rcd. 8752 (1992).................................................................................22

*Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27
   FCC Rcd. 1830 (2012).................................................................................18

*Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 29
   FCC Rcd. 3442 (2014)............................................................................19, 24

# I. **INTRODUCTION**

This case is based on a single informational, non-marketing, notification message ("Welcome Message") appended to a Yahoo user's own message sent via Yahoo Messenger's free PC2SMS service. The Welcome Message alerts the recipient that she has received a message from another Yahoo user, explains what the message is and what to do if the recipient wants to respond or wants additional information, including about blocking future messages. The Welcome Message is not the type of annoying, intrusive mass communication forced onto consumers by telemarketers that the Telephone Consumer Protection Act ("TCPA") was enacted to prevent, and the FCC has recognized that informational messages are "highly desirable" to consumers and should not be discouraged.[1] Rather, the PC2SMS platform is a free service that benefits the elderly, visually impaired, and others who cannot easily compose messages on small smart phone screens, low income individuals who cannot afford a smart phone or a monthly data plan or do not want to incur message charges, and others who for myriad reasons cannot access a smart phone. Nevertheless, Susan Pathman (a serial plaintiff) seeks to certify a class of people who received the Welcome Message on one occasion and seeks more than ████████ in statutory damages despite no economic injury or harm.

Plaintiff's proposed class is fundamentally flawed. First, it is not ascertainable, from either Yahoo's records alone or Yahoo's records combined with AT&T records. Second, individualized issues of consent predominate. Third, Pathman's contorted proposed class promotes piecemeal litigation rather than judicial economy and is therefore not superior. Fourth, Pathman is not an adequate representative and her claims are not typical of the class because her conduct prior and subsequent to receiving the text message at issue puts her interests in conflict with those of other class members and subjects her to unique defenses. The proposed class simply does not withstand the rigorous analysis required to certify a Rule 23(b)(3) class.

---

[1]     These types of notification messages are so harmless that plaintiff proposes notifying class members of this action through text message using Yahoo's records. Mot. 12.

**The class is not ascertainable.** Although plaintiff has purported to narrowly slice the class she originally proposed to try to avoid the obvious ascertainability issue, she has not solved her problem. The class plaintiff proposes cannot be identified by cross-referencing two Yahoo databases that are maintained completely independently of each other, one created solely for the purpose of preventing potential recipients from receiving multiple copies of the Welcome Message, and the other to store personal information provided by the Yahoo user if they choose to provide it, though many users choose to remain pseudonymous (e.g., Pathman's first Yahoo ID, "████████"). Plaintiff's own profile illustrates one type of ascertainability issue. As learned through discovery, another Yahoo user inadvertently entered Pathman's cell phone number in connection with his account. Pathman then received the Welcome Message. Based on Yahoo's records, both Pathman and the other Yahoo user would be identified as class members, even though the other user did not receive the Welcome Message. In at least ten instances, a single telephone number is associated with more than ██ Yahoo IDs, including two numbers that are each associated with more than ██ Yahoo IDs. Identifying the Yahoo users who received the Welcome Message would therefore require individualized inquiries and investigation. Moreover, a user who "associated" her number with her Yahoo account at some time in the past 20 years was not necessarily the owner of that number in May 2013, when the Welcome Message was received by the class member.

Recognizing the gaps and user-generated inaccuracies in Yahoo's records, plaintiff proposes – in passing – that these gaps can be filled by subpoenaing AT&T. Putting aside that plaintiff has not done so in the nearly 28 months that this lawsuit has been pending (except for her own personal records), and assuming that AT&T would even agree to produce these voluminous and sensitive records for its subscribers (and other wireless carriers have successfully opposed doing so in similar class actions), the AT&T records would not render this class ascertainable because for a substantial number of its subscribers, AT&T does not know the identity of the subscriber of the number. Specifically, 90% of AT&T's postpaid smart phone subscribers – approximately 44 million subscribers – were on

a group plan in 2013 (as demonstrated by another plaintiff suing Yahoo in a parallel action filed in the Northern District of Illinois). Additionally, because AT&T does not require a name or address to obtain a pre-paid phone, it will not have subscriber information for all purchasers of pre-paid phones, which in Q2 2013, was 9.7 million subscribers.

**Individualized issues of liability and consent predominate.** Even if these substantial ascertainability hurdles could be overcome, issues of consent and liability for most class members cannot be determined based on evidence common to the class. Rather, consent and liability would need to be determined on an individualized basis through separate depositions of class members and in some cases forensic review of their individual cell phones (as was done for Pathman to confirm receipt of the Welcome Message). While all Yahoo users assent to one or more of Yahoo's terms of service which include different provisions stating that users agree to receive notices from Yahoo pertaining to its services, whether a putative class member provided prior express consent depends on multiple factors that vary by user, and that cannot be determined without individualized inquiry (and not from Yahoo's records), including whether the user has any additional Yahoo accounts, installed a Yahoo application, or provided consent through an intermediary. The existence and timing of these variables (unknown and unknowable to Yahoo without individualized inquiry) will determine the existence and scope of the consent provided to Yahoo, and can only be resolved by mini-trials.

**A class action is not superior.** Certification of the proposed class will cause "precisely the multiplicity of activity which Rule 23 was designed to avoid." (*Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 551 (1974)) because it invites others to sue Yahoo for the 47 months that Pathman is not seeking to certify (indeed, plaintiffs in the parallel Illinois action have already moved to do so for an additional two months of the originally proposed class period). Further, the legislative history demonstrates that Congress envisioned that claims would be brought by individuals in small claims court, and provided a mechanism for consumers to easily and inexpensively bring individual claims for statutory damages without having to pay attorneys' fees.

**Pathman is not an adequate representative, nor are her claims typical.** Pathman cannot adequately represent those class members who have a different consent profile than hers – those, for example, who provided their phone number to Yahoo before (rather than after, like Pathman) receiving the Welcome Message, or those who provided consent through an intermediary. Additionally, Pathman's spoliation of evidence in this case (discovered only through a Court-ordered forensic image of her cell phone), and her history of filing apparently attorney-sponsored litigation, will require her to pursue defenses and strategies that are unique to her, to the detriment of the class.

Pathman's proposed class should not be certified.

## II. <u>STATEMENT OF FACTS</u>

### A. <u>Yahoo's PC2SMS Service Is A Free Messaging Service</u>

Yahoo's PC2SMS service allows registered Yahoo users to send an SMS message from their computers. Declaration of A. Doron ("Doron Decl.") ¶ 3. When a Yahoo user sends a PC2SMS message to a cell phone number for the first time, an informational Welcome Message is appended[2] to the user's message explaining to the recipient that the text was sent by a Yahoo user (since it otherwise appears to come from an unknown short code rather than a phone number or name). *Id.* ¶ 9. During the relevant time period, the Welcome Message provided a link to Yahoo's website where the recipient could obtain further information, including on how to stop receiving future PC2SMS messages. *Id.*

The PC2SMS service is not designed to be used as a mobile marketing platform. In fact, it *cannot* be used to send messages in bulk, or even messages already prepared; it can only be used to send a single, original message, manually typed by a single person, addressed to only a single person, one at a time, and is not even capable of sending the same message to a group or more than one recipient. *Id.* ¶ 5.

The PC2SMS platform provides an invaluable, free communication tool to certain users that would not otherwise be able to send or afford to send text messages. Expert

---

[2] The Welcome Message is part of the user message, but because of character limitations (a single text message cannot exceed 140 characters), the message appears as two separate messages.

Declaration of D. Boyd ("Boyd Decl.") ¶¶ 7, 15 (e.g., vision impaired or physically disabled users, elderly users, users who are economically disadvantaged, anyone who has needed to contact someone via text when that person is abroad, when the sender's phone has been lost, broken, or the battery has died).

**B.    The Identity Of The Recipient Of The Welcome Message Cannot Be Ascertained From Either Yahoo's Records Or By Subpoenaing AT&T**

Plaintiff proposes ascertaining the class by cross-referencing two unrelated Yahoo databases, the Optin DB and User Database ("UDB"). Mot. 10-12. As set forth below, however, these databases operate and are maintained completely independently of one another, and are created for different reasons – the Optin DB stores phone numbers to prevent recipients from receiving duplicative Welcome Messages, while the UDB stores information that users choose to provide Yahoo (typically when they first register). Doron Decl. ¶¶ 8, 13, 16. Plaintiff concedes that independently, the databases do not contain the information that would allow a class to be ascertained; but she is incorrect that together they can provide the necessary data.

The proposed cross-referencing fails because the Optin DB data is limited based on its function, and the UDB data is limited based on what users choose to input (which often is limited in scope or provided pseudonymously to protect their privacy). *Id.* ¶ 18. Additionally, the accuracy or currency of the information in either database cannot be verified without individualized inquiry. *Id.* ¶ 19. In other words, even where there is an overlap between a number in the Optin DB and the UDB, that does not necessarily identify the class member because, among other reasons described below, the information in the UDB about the user is incomplete, and the number to which the message was sent in May 2013 – even if it corresponds to a user in the UDB – may not still belong to the same person who had the number in May 2013 because of (a) AT&T's high volume of annual number recycling; (b) the fact that in 2013, 90% of AT&T smartphone users were on group plans that do not specifically identify the appropriate individual by name; and (c) the fact that information in the UDB may be 15 or more years old. *Id.* ¶¶ 17, 21; Expert Declaration of

5

Debra Aron ("Aron Decl.") ¶¶ 21-25, 36.

***The Optin DB records phone numbers, not subscriber information.*** When a cell phone number is inputted into PC2SMS by a Yahoo user for the first time, that number is stored in the Optin DB database. The Optin DB was created solely for the purpose of preventing potential recipients from receiving multiple copies of the Welcome Message within a one-year period. Doron Decl. ¶ 8. Because the service was not intended as a mobile marketing platform and was not intended as a means for Yahoo to collect contact information to market its own services, the six data fields the Optin DB records do not identify either the sender or recipient of a message. *Id*. ¶¶ 5, 12.

***The UDB is not part of PC2SMS, does not track or identify which users sent a PC2SMS message, and does not maintain uniform user data.*** The UDB records all registered Yahoo user account information. *Id*. ¶ 15. Yahoo allows users the choice of providing Yahoo with personal, identifying information, or allowing them to preserve pseudonymity by providing only a Yahoo ID (which is usually not a full name – for example, plaintiff Pathman's first Yahoo ID ██████████, or former named plaintiff Sherman's Yahoo ID ██████████). *Id*. ¶ 18. Whatever additional information users voluntarily choose to share with Yahoo, which may but often does not include a cell phone number, will then be associated with that Yahoo ID in the UDB. *Id*. The user data stored for each account varies considerably because Yahoo did not collect the same type of information from each user. *Id*. Before September 2013, a person registering a new Yahoo account needed only to provide his or her name (full name not required) and zip code. *Id*. After September 2013, all new users were required to provide a cell phone number to register an account with Yahoo; before then, this was merely optional. *Id*. Users have never been required to provide any additional contact information, such as an address. *Id*.

Yahoo does not verify whether a user has provided accurate information—indeed, for many years, internet companies such as Yahoo discouraged users from revealing their real names for safety concerns. Therefore, the UDB contains accounts where the only contact information available is the user's Yahoo email address, which may or may not be

associated with a person's true or full name, and in most cases is simply connected to a user ID (such as ⬛⬛⬛⬛⬛) that does not allow Yahoo to identify the name of the account owner and cross-reference other data with that user ID. *Id*. Yahoo further does not verify on an ongoing basis whether the information provided by the user in the UDB is current or accurate. *Id*. ¶ 19. Accordingly, even where a user provided his or her cell phone number in the UDB, if that user changed his or her number the following day, Yahoo would not have knowledge of that change unless the user updated his or her account profile. *Id*.

Cross-referencing the Optin DB and UDB therefore cannot reveal whether the recipient of the Welcome Message in May 2013 is the same person who is associated with the number in the UDB.

**C.** **Putative Class Members Assented To One Or More Versions Of Yahoo's Terms Of Service Agreements Providing Prior Express Consent For Yahoo To Send Text Messages**

As a precondition to creating a Yahoo account, every registrant is required to expressly agree to the then-current version of Yahoo's terms of service agreement applicable to the specific service the user is signing up for, and many users assent to multiple different versions over time. Declaration of J. Andrews ("Andrews Decl.") ¶ 3. Importantly, while Yahoo sometimes knows the date on which a user assented to a terms of service agreement and therefore the specific terms the user is bound by, other times it does not know and cannot determine, without an individualized inquiry, the scope of the user's consent to receive communications from Yahoo. *Id*. ¶ 18.

Yahoo's Universal Terms of Service agreement ("uTOS") governs every user's relationship with Yahoo and their use of all products and services offered by Yahoo. *Id*. ¶ 4. Yahoo users may also be required to agree to additional terms of service that govern the use of certain Yahoo products and services, such as Yahoo's Communications Additional Terms of Service agreement ("Comms ATOS") (which incorporates the uTOS) and pertains to Yahoo Mail and Yahoo Messenger, which includes the PC2SMS Service. *Id*. ¶ 5.

Yahoo updates the uTOS from time to time. *Id*. ¶ 13. Since August 2007, the uTOS

expressly provides consent for Yahoo to send users text messages ("Notice Provision"):

> Yahoo! may provide you with notices, including those regarding changes to the TOS, including by but not limited to email, regular mail, SMS, MMS, text message, postings on the Service, or other reasonable means now known or hereinafter developed.

*Id.* ¶ 16, Ex. C (uTOS ¶ 24).[3] By agreeing to the uTOS, users also expressly agree that Yahoo may send them communications regarding all aspects of the services Yahoo provide, including in connection with "various communication tools". *See id.* Ex. C (uTOS ¶ 2).[4] The Comms ATOS contains a similar provision. *See id.* Ex. A (Comms ATOS at ¶ 2(e)) ("You also understand and agree that the Services may include certain communications from Yahoo!, such as service announcements and administrative messages and that you will not be able to opt out of receiving such communications.").

All users must expressly assent to one or more of a version of Yahoo's terms of service agreement(s) at registration and represent when creating an account that "I agree to the Yahoo Terms and Privacy". *Id.* ¶ 3. The specific types and versions of terms of service contract(s) assented to by users has varied over time: before late 2010, users agreed only to the uTOS; from late 2010 to mid-2013, users agreed to both the uTOS and Comms ATOS; from 2013 to approximately March 2015, users agreed to the Comms ATOS and incorporated uTOS; and since approximately March 2015, users have agreed to both the uTOS and Comms ATOS agreements. *Id.* ¶¶ 7-12.

Which contract governs cannot be easily determined based on the date a user first created a Yahoo account because many users assented to more than one version and type of

---

[3]     Prior to August 2007, the Notice Provision stated "Yahoo! may provide you with notices, including those regarding changes to the TOS, by email, regular mail or postings on the Service." Andrews Decl. Ex. B (uTOS ¶ 24).

[4]     Paragraph 2 of the uTOS provides: "Yahoo! provides users with access to a rich collection of resources, including various communications tools, [etc.] . . . (the 'Service'). You also understand and agree that the Service may include advertisements and that these advertisements are necessary for Yahoo! to provide the Service. You also understand and agree that the Service may include certain communications from Yahoo!, such as service announcements, administrative messages and the Yahoo! Newsletter, and that these communications are considered part of Yahoo! membership and you will not be able to opt out of receiving them."

the terms of service agreements, and only some of those consent events can be determined without an individualized inquiry (i.e., through Yahoo's records). *Id.* ¶ 18. Yahoo users also have been prompted to expressly reaffirm their assent to Yahoo's various terms of service as a requirement to continue using their Yahoo account such as when, starting in 2010, Yahoo introduced an entirely new mail platform and required all current subscribers to expressly assent to the Comms ATOS agreement and reaffirm their assent to the uTOS. *Id.* ¶ 19.

Additionally, each time a user installs an application (such as the desktop client to be able to use Yahoo Messenger), sets up a new email account, or signs up for a new service (such as Flickr), the user is required to provide assent to the then-current version of the terms of service agreement(s). *Id.* ¶ 18. Yahoo does not maintain records of Yahoo users who expressly agreed to the uTOS agreement (and Comms ATOS) through the installation of applications, such as the Yahoo Messenger application, as opposed to through its website. *Id.* ¶ 18. Accordingly, a given user may have provided express assent to multiple versions of the uTOS and/or Comms ATOS agreements at multiple intervals, but Yahoo would have to examine each user's current and prior computers, phones, or other devices to determine the date of installation and consent. *Id.* ¶ 18.[5]

**D.**  **Susan Pathman Consented To Receive Text Messages From Yahoo And Voluntarily Provided Her Mobile Number To Yahoo**

Pathman is an active Yahoo user. Declaration of N. Boyajian ("Boyajian Decl.") Ex. K (Pathman Dep. 132:23-134:3); Declaration of Justin A. Barton in Support of *Ex Parte* Application for Leave to File Documents Under Seal ("Barton Decl.") Ex. 8. She created her first Yahoo account, ███████, in October 2000, and her second Yahoo account, "████," in March 2013, and therefore affirmatively agreed to both the uTOS and the Comms ATOS agreements in effect at those times. Doron Decl. ¶¶ 35-36; Andrews Decl. ¶¶ 7, 10. Pathman also agreed to the Comms ATOS in October 2012 during the migration to

---

[5]    While all current users are bound to the current version of the uTOS and/or Comms ATOS (based on the express terms of the agreements they originally assented to), users who discontinued use of or closed their Yahoo accounts would only be bound by older versions of the terms of service contracts.

the new mail platform. Doron Decl. ¶ 35; Andrews Decl. ¶ 19. Pathman therefore twice assented to the uTOS and Comms ATOS prior to receiving the Welcome Message on May 1, 2013, thereby expressly agreeing that Yahoo could contact her through SMS about its services. Doron Decl. ¶¶ 35-36; Andrews Decl. ¶¶ 7, 10, 19. In November 2013 – after twice assenting to both the uTOS and Comms ATOS and receiving the Welcome Message from Yahoo – Pathman also added her mobile number to her ███████ Yahoo account. Doron Decl. ¶ 35.[6]

Pathman – like former named plaintiff Rafael Sherman and plaintiff Rachel Johnson in the parallel Illinois action[7] – is also a serial class action plaintiff. Boyajian Decl. Exs. K, M (Pathman Dep. 45:11-75:1, Dep. Exs. 7-12); Exs. O, P (Sherman Dep. 30:23-31:1; 32:10-17; 37:7-40:1 & Dep. Exs. 27, 29); Ex. Q (Johnson Dep. 65:6-16, Apr. 1, 2015). She has previously served as a named plaintiff in at least five putative class actions—including three TCPA suits—and settled at least two of them individually, prior to class certification, to the detriment of the classes she purported to represent. Boyajian Decl. Ex. K (Pathman Dep. 45:11-75:1; 234:15-255:5); Barton Decl. Ex. 8.

A forensic copy of the PC2SMS messages that Pathman received on May 1, 2013 does not exist. Boyajian Decl. Ex. K (Pathman Dep. 164:6-15). While Pathman took a screenshot of the Welcome Message to send to her lawyer, she did not preserve the original text or the related metadata, and in fact *deleted* the Welcome Message and disposed of the

---

[6]    While Pathman claims that she never provided Yahoo with her phone number, Yahoo's records indisputably reflect that she added her phone number to her account, which was confirmed through a message to her phone. Doron Decl. ¶ 35; Boyajian Decl. Exs. K, L (Pathman Dep. 21:5-22:2; 166:15-168:13 & Dep. Ex. 22). Pathman confirmed that no one else has the login credentials for either of her Yahoo accounts. Boyajian Decl. Ex. K (Pathman Dep. 259:3-16, 261:1).

[7]    Zenaida Calderin and Rachel Johnson both filed putative class action lawsuits against Yahoo in the Northern District of Illinois alleging violations of the TCPA based on their alleged receipt of the Welcome Message. The *Johnson* and *Calderin* cases have been consolidated (*Johnson v. Yahoo! Inc.*, Case No. 14-cv-2028 (N.D. Ill.)), and that consolidated case is coordinated with this case for some purposes, including discovery. *See* Amended Confidentiality Protective Order (Dkt. 94). Proposed class counsel in this case are also counsel for plaintiffs in the Illinois action.

1    handset.[8] Boyajian Decl. Exs. K, N (Pathman Dep. 219:5-22 & Dep. Ex. 56).

## III.   LEGAL STANDARD

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)); *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011); *Smith v. Microsoft Corp.*, 297 F.R.D. 464, 467 (S.D. Cal. 2014) ("In addition to the Rule 23 requirements, the party seeking class certification must provide a workable class definition by showing that the members of the class are identifiable.").

Further, because Pathman seeks certification under Rule 23(b)(3), she must prove that "questions of law or fact common to class members *predominate* over any questions affecting only individual members," and that "a class action is *superior* to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3) (emphasis added). As the Supreme Court has explained, "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). To meet her burden, Pathman cannot simply allege compliance with Rule 23; she must "affirmatively demonstrate" that the case can be tried on a classwide basis. *See Dukes*, 131 S. Ct. at 2551. As the Supreme Court has instructed, "Rule 23 does not set forth a mere pleading standard," and a plaintiff "seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact," and the other Rule 23 requirements. *Id*.; *see also Cottle-Banks v. Cox Commc'ns, Inc.*, No. 10cv2133-GPC (WVG), 2013 WL 2244333, at *5 (S.D. Cal. May 21, 2013) (plaintiff must prove the requirements of Rule 23 by a preponderance of the evidence; denying certification

---

[8]    Yahoo would not have known that Pathman deleted the Welcome Message or that she was no longer in possession of the phone on which she received the message if it were not granted leave – over Pathman's vehement objections – to take a forensic image of her handset. Boyajian Decl. Ex. K. Pathman's failure to preserve is particularly egregious given her extensive experience in serving as a named plaintiff. Boyajian Decl. Exs. K, M (Pathman Dep. 45:11-75:1 & Dep. Exs. 7-12).

11

for lack of commonality). A court must engage in a "rigorous analysis" and evaluate the "merits of the plaintiff's underlying claim." *Dukes*, 131 S. Ct. at 2551; *Comcast*, 133 S. Ct. at 1432; *see also Ellis*, 657 F.3d at 981 ("[I]t is not correct to say a district court *may* consider the merits to the extent that they overlap with class certification issues; rather, a district court *must* consider the merits if they overlap with the Rule 23(a) requirements.").

## IV.    ARGUMENT

### A.    Pathman Has Not Met Her Burden Of Proving That Class Membership Can Be Ascertained From Collective Evidence

As this Court has explained, ascertainability "requires the definition to contain sufficiently objective criteria for an individual to identify himself or herself as a member of the putative class." *Knutson v. Schwan's Home Serv., Inc.*, No. 12-0964-GPC, 2013 WL 3746118, at \*5 (S.D. Cal. July 15, 2013). Plaintiff has not met her burden.

#### 1.    Yahoo's Records Cannot Identify All Users Who Were Sent A Message

Recognizing that the class definition as originally pled was unascertainable, Pathman has materially revised the class by no longer limiting members to those who "received" the Welcome Message "without prior express consent," asserting only that the class comprise of persons who were "sent" the message in May 2013 and whose phone number was assigned to AT&T/Cingular and is "associated with a Yahoo account". Mot. 6. But these changes still do not provide a workable definition because Pathman has not demonstrated that there exists any source of information (including any combination of data), from which the proposed class can be ascertained.

Pathman argues that class members may be identified by cross-referencing data from the Optin DB and UDB databases, but this is not true. The Optin DB (the sole database that records PC2SMS activity) contains simply a list of phone numbers that are not associated with any other contact information. Doron Decl. ¶¶ 13-14. The UDB, by contrast, lists users but does not include cell phone numbers in most cases (or even full or accurate names and mailing address) – just the user ID selected by a user and his or her Yahoo email address, which may or may not be currently active. *Id.* ¶ 18. Further, even where numbers can be

"associated" with a user account (which based on Pathman's revised class implicates potentially ███████ accounts identified from ████████ telephone numbers), it is by no means clear that the person who had the number at the time it was provided to Yahoo in fact had that same number in May 2013 (or was an AT&T/Cingular subscriber at that time), or that the number was even subscribed to that person in the first place. This is illustrated by Pathman's own phone number, which is "associated" with two users (discussed below).[9] *Id.* ¶¶ 21-23 ; Aron Decl. ¶¶ 22-23 (each year 45 million people in the United States change their phone number; according to the FCC's most recent yearly report, there were 14.3 million wireless numbers that were disconnected from a carrier's network in one year and that the customer chose not to port move to another provider).

Neither class members nor the Yahoo users who sent them a PC2SMS message can be ascertained from Yahoo's records, and ultimately the Court would need to resort to individualized inquiries to determine who belongs in the class—which given there are potentially ██████ Yahoo accounts at issue, is administratively unfeasible. *See Gannon v. Network Tel. Servs., Inc.*, No. CV 12–9777–RGK (PJWx), 2013 WL 2450199, *2 (C.D. Cal. June 5, 2013) (TCPA class "unascertainable and unidentifiable" because "[t]he Court cannot determine whether an individual is part of the class without extensive individual inquiry into the merits of Plaintiff's claim, which ultimately makes identification of the class administratively unfeasible"); *Smith*, 297 F.R.D. at 467 & 473 (Rule 23 is concerned with "identifying and providing notice to the class members as individuals, not merely numbers on a list").

Indeed, at least ████ of the Yahoo account-holders Pathman contends make up the class cannot be determined based on evidence common to the class because these Yahoo accounts were created *after* the Welcome Message may have been sent to them (though they may have other Yahoo accounts created before they received the Welcome Message). Doron

---

[9]     Even Pathman concedes that the UDB does not contain complete or accurate information. *See* Mot. 11 ("Yahoo's account records indicate the names, email address, and mailing address information for the account holder *where such information is provided by the account holder.*") (italics added).

Decl. ¶ 32. Determining whether the account linked to a number is that of the person who owned the number in May 2013—and therefore class membership and consent—would need to take place on an individualized basis by performing manual, individualized inquiries of Yahoo's records, individualized discovery, and, in some cases, depositions. *Id.* ¶¶ 24-26.

The inherent inaccuracies that preclude reliance on unrelated Yahoo records—records that were intended to preserve user privacy, not to precisely identify individuals or link their contact information to phone numbers—to ascertain the proposed class, are illustrated by Pathman's own number and account profile. Yahoo only learned that the other Yahoo user with whom her number is associated has no relationship with Pathman as a result of deposing Pathman and reviewing documents produced by her in this case. Barton Decl. Ex. 5. Pathman's situation is not unique. In fact, in at least ten instances, a single telephone number in the Optin DB is associated with more than ███ Yahoo IDs, including two numbers that are each associated with more than ███ Yahoo IDs. Doron Decl. ¶ 22. Pathman's ██████████ account also shows her full name as ██████████ which is both incomplete and inaccurate. *See* Kazerounian Decl. [Dkt. 121-2] Ex. M.

Without the benefit of this individual discovery from Pathman, there would have been no way for Yahoo to determine that Pathman, and not ██████████ (or ██████████ was the person who received the text in May 2013. *See* Request for Judicial Notice ("RJN") Exs. 1-5 (indicating that ██████████ phone number is only one digit different than Pathman's phone number); Barton Decl. Ex. 5. There is simply no way to filter out Yahoo users who (a) could have input the wrong phone number (like ██████████), or (b) may at one point have been the subscriber of a number recorded in the Optin DB, but not in May 2013. Doron Decl. ¶ 23; *see* Aron Decl. ¶¶ ██████ (re: number portability). This cannot be determined based on Yahoo's or AT&T's records.

The class definition is therefore both over-inclusive and under-inclusive because a phone number that is merely "associated with a Yahoo account" would capture users who, like ██████████, have no claim because they are not in fact associated with the number recorded in the Optin DB, and users who may have been associated with a number at one

point, but not in May 2013, because they changed their number either before or after that time period, and therefore were not sent the text. None of these questions can be resolved without resorting to individual inquiries. *See also* Aron Decl.¶ 20 (providing numerous other examples). Accordingly, the class is not ascertainable. *See Cottle-Banks*, 2013 WL 2244333, at *10 (denying certification and concluding that the class was not ascertainable because it was "overbroad and imprecise as it includes individuals who signed up online where the challenged information was conveyed and affirmatively accepted by the customer, and those individuals who purchased equipment at the retail stores"); *Spencer v. Beavex*, No. 05-CV-1501 WQH (WMc), 2006 WL 6500597, at *9 (S.D. Cal. Dec. 15, 2006) ("[a]lthough [an] objective criteria might exist for determining class membership[,] . . . applying those criteria would be administratively infeasible" because plaintiff failed to show "that it could be readily and reliably determine whether each driver actually drove a given route on a particular day" where defendant's records only tracked drivers who invoiced defendant for servicing a route but did not necessarily identify the actual driver who drove that day).[10]

### 2.    Pathman Failed To Show That Class Members Can Be Identified By Subpoenaing AT&T

Plaintiff admits that she has not carried her burden to show through admissible evidence which telephone numbers are associated with an AT&T and/or Cingular account. *See, e.g.*, *Dukes*, 131 S. Ct. at 2551. This is another new limitation on the proposed class

---

[10]     Pathman's reliance on *Hofstetter v. Chase Home Fin., LLC*, No. C 10-01313 WHA, 2011 WL 1225900 (N.D. Cal. Mar. 31, 2011) and *Abdeljalil v. GE Capital Corp.*, 12 cv 02078-JAH (MDD), 2015 WL 1346850 (S.D. Cal. Mar. 26, 2015), does not help her because those cases involved records containing different (and more complete) information than the unrelated databases plaintiff focuses on here. *Hofstetter* involved non-TCPA claims where defendant's business records showed that practices were applied uniformly, and defendant's agreements with members of the class contained "manageable" variations. *Hofstetter*, 2011 WL 1225900, *7, 10-11. In *Abdeljalil*, the defendant "[did] not claim it would be unmanageable or unfeasible to ascertain the class," and therefore the court found that class membership could likely be determined based on defendant's business records. 2015 WL 1346850, at *4. In addition, Pathman cites *Negrete v. Allianz Life Ins. Co. of N. Am.*, 238 F.R.D. 482, 494-95 (C.D. Cal. 2006) for the proposition that "plaintiffs need only show that their proposed methods are plausible," but this quote dealt with the issue of common proof regarding proposed methods of calculating damages, and the court did not discuss ascertainability.

included for the first time in plaintiff's motion, and not surprisingly, plaintiff has not made any effort to carry her burden. Instead, plaintiff briefly mentions *how* she *could* identify AT&T users through third party subpoenas. Pathman's "backup" argument—to which she dedicates a single sentence in her brief (Mot. 12:7-11)—fails because she has not and cannot demonstrate that class members can be identified by subpoenaing records from AT&T.

Pathman inexcusably did not bother to subpoena AT&T during class discovery (except for her own records). Class discovery is now closed, and whether AT&T could and would be willing to turn over detailed subscriber information for ███████████ of its customers is, at best, merely based on hypothesis and conjecture, and Pathman offers nothing but speculation as to what AT&T's records would show with respect to each class member. This speculation is not legally insufficient. *See, e.g.*, *In re Teflon Prods. Liab. Litig.*, 254 F.R.D. 354, 361 (S.D. Iowa 2008) ("The Court should not be required to resort to speculation…in order to identify class members.").

Even if AT&T agreed to provide this sensitive customer information—though AT&T (like many other carriers) will likely object based on California privacy law—simply subpoenaing AT&T for contact information for each of the phone numbers listed in the Optin DB would not be sufficient to ascertain the class.

First, the subscriber of a phone number may not be the person who received the text. Where there is a group account, AT&T only requires the name of the account holder, not the names of all users on that group account. *See* Aron Decl. ¶ 32. This alone presents a significant impediment to ascertainability where in 2013, 90% of AT&T's postpaid smart phone subscribers – approximately 44 million subscribers – were on a group plan (either family or business). *Id.* ¶ 36.[11] This precise situation is illustrated by plaintiff Johnson in the parallel Illinois action, where her phone number is in fact subscribed to her employer, ███████████, the named account holder of a group plan. Boyajian Decl. Ex. Q; (Johnson Dep. 24:4-27:21); Barton Decl. Exs. 6-7 (Johnson Dep. Ex. 2).

---

[11]     Family and multiline plan subscribers represent, at a minimum, 40% of AT&T's total subscribership (i.e., 44 million out of 108 million subscribers). Aron Decl. ¶ 36.

Second, because AT&T does not require a name or address in order to obtain a pre-paid phone, it may not have subscriber information for purchasers of pre-paid phones. Aron Decl. ¶ 37 (AT&T reported that in Q2 2013, there were 7.1 million prepaid subscribers out of a total of 107.9 million subscribers, or 7% of total subscribers). Other circumstances in which telephone carrier records would not accurately identify the name of the putative class member include situations in which a parent, relative, or friend owns and pays for the user's telephone. *Id.* ¶ 38.

Third, AT&T would likely follow T-Mobile, Sprint, and other carriers who have refused in other TCPA cases to turn over similar records pertaining to their California customers due to a well-established right to privacy in telecommunications subscriber information codified in California Public Utilities Code section 2891(a)(4), which prohibits phone companies from disclosing customer information without the subscriber's consent.[12] This is likely why Pathman did not even try to subpoena AT&T's records.

There is also no proof to support Pathman's assumption that it would be easy for class members to self-identify and determine whether they received a Welcome Message text in May 2013—as Pathman's own experience again illustrates.[13] *See* Mot. 12. People are not

---

[12] *See, e.g. Birchmeier v. Caribbean Cruise Line, Inc.*, No. 12 C 4069 (N.D. Ill. Mar. 20, 2015) [Dkt. No. 288] (denying plaintiff's motion to compel T-Mobile to produce California subscriber records in TCPA case) (*see* Boyajian Decl. Ex. T); *In re Farsheedi*, No. C 09–3888 JF, 2009 WL 4572745, at *1 (N.D. Cal. Dec. 4, 2009) (acknowledging Order denying motion to compel T-Mobile to disclose subscriber records under CAL. PUB. UTIL. CODE § 2891(a)); *Tataryn v. Barnett,* No. 08FL00527, slip op. at 4 (Cal. Super. Ct. June 9, 2014) ("On the balance, review of the statutes supports the view that PUC section 2891 applies to mobile subscribers.") (Boyajian Decl. Ex. U); *see also* CAL. CIV. PROC. CODE § 1985.3(f) ("A subpoena duces tecum for personal records maintained by a telephone corporation which is a public utility, as defined in Section 216 of the Public Utilities Code, shall not be valid or effective unless it includes a consent to release, signed by the consumer whose records are requested, as required by Section 2891 of the Public Utilities Code.").

[13] District Courts in the Ninth Circuit are split on whether consumers must present receipts or other proof of small-dollar purchases to satisfy the ascertainability requirement (*see, e.g., Lilly v. Jamba Juice Co.*, No. 13-2998, 2014 WL 4652283, at *__ (N.D. Cal. Sept. 18, 2014)), and this issue is currently pending before the Ninth Circuit in *Jones v. ConAgra* (Case No. 14-16327). However, this Court need not confront this issue here, because plaintiff has failed to offer any administratively feasible way to ascertain putative class members. Nor does this case present small-dollar consumer products—statutory damages per class member under the TCPA are set at a minimum of $500.

17

likely to retain non-personal messages like the Welcome Message and often switch phones without copying over old texts—Pathman herself purchased *at least two new phones* since receiving the text in May 2013 (including after filing this lawsuit), *deleted the message* from her phone (which Yahoo only discovered through a forensic image of her phone), and did not even keep her old phone despite her obligation to preserve relevant evidence as a named plaintiff. *See* Aron Decl. ¶ 51 (in 2013, users changed handsets every 22.4 months; in 2014, users changed handsets every 26.5 months); Boyajian Decl. Ex. K (Pathman Dep. 213:25-214:10); Kazerounian Decl. Ex. V. Indeed, three of the four named plaintiffs that have sued Yahoo for the Welcome Message do not have the handset on which they received the message. Boyajian Decl. Ex. K (Pathman Dep. 213:25-214:10); Ex. O (Sherman Dep. 19:7-9); Ex. Q (Johnson Dep. 37:9-38:15). Given the new class definition that includes only people who received a Welcome Message in the same month as Pathman it is even less likely that users will recall receiving this one specific message in that one particular month (as opposed to at some time in the past four years).

Accordingly, because Pathman failed to affirmatively demonstrate that the class is ascertainable, class certification should be denied on this basis alone.[14]

**B.**   **Common Issues Do Not Predominate Because Consent and Liability Cannot Be Determined Based On Classwide Proof**

Plaintiff acknowledges that one of the "principal factual and legal issues in this case" is whether the text message was sent without the class member's consent.[15]   (Mot. 20:18–

---

[14]   Pathman's reliance on *Santillan v. Ashcroft*, No. C 04-2686 MHP, 2004 WL 2297990 (N.D. Cal. Oct. 12, 2004) to argue that she does not have to "identify every potential member at the moment of certification" (Mot. 10:6-8) is misplaced, as the quote from *Santillan* was analyzing numerosity, not ascertainability. *See* 2004 WL 2297990, at *9-10.

[15]   The TCPA does not prohibit informational calls, like the Welcome Message, made with "prior express consent." 47 U.S.C. § 227; 47 C.F.R. § 64.1200(a)(1). The Welcome Message is an informational, non-marketing message, and does not "advertis[e] the commercial availability or quality of any property, goods, or services." *See* 47 U.S.C. § 227(a)(5). The Welcome Message is plainly not an advertisement or "spam" (as Pathman falsely asserts). *See, e.g., Aderhold v. Car2go N.A., LLC*, No. C13-489RAJ, 2014 WL 794802, at *1, 9 (W.D. Wash. Feb. 27, 2014) (rejecting plaintiff's argument that a text containing the message constituted a telemarketing text simply "because the text directed him to place an activation code into an email that ultimately connected to the car2go website

19). Yet, plaintiff attempts to skirt this issue by arguing that "all of Yahoo's consent theories . . . apply to the class as a whole" (*id*. at 20:24), without ever explaining how that can be when the evidence shows that different class members (and indeed the named plaintiffs) agreed to different terms of service at different points in time; that different class members provided their cell phone numbers to Yahoo under varied circumstances; and that many class members have unique interactions that bear on the issue of consent, such as asking a friend to contact them through Yahoo's PC2SMS service, installing a Yahoo application (and when), or owning multiple accounts (and when the accounts were created). *See* Doron Decl. ¶¶ 24-26, 52. While Yahoo can determine that some class members provided consent (assuming they provided their number to Yahoo, and have had that same number since May 2013), for an indeterminate number of potential class members, consent cannot be determined without these individualized inquiries.

Where individualized proof is necessary to determine consent, as it is here, plaintiff cannot meet her burden of establishing predominance. *See Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 328-29 (5th Cir. 2008) (finding no viable theory of generalized proof

---

which contains promotions for the car2go service"). Indeed, Pathman and Sherman *admitted* that the Welcome Message is merely a "notice" that a Yahoo user sent them a message. *See* Boyajian Decl. Ex. K Pathman Dep. 155:8-10; Ex. O Sherman Dep. 127:10-13; *see also* Ex. Q, (Johnson Dep. 44:19-45:7).

The FCC acknowledges that the TCPA was not intended to chill informational messages. *See, e.g., Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1841 (2012) ("wireless services offer access to information that consumers find highly desirable and thus [we] do not want to discourage purely informational messages.") (footnote omitted); *GroupMe, Inc./Skype Comm'cns S.A.R.L. Petition for Expedited Declaratory Ruling Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 29 FCC Rcd. 3442, 2014 WL 1266074, at *1 (2014) [hereinafter "*GroupMe*"] ("[O]ur goal is to make sure the TCPA is not interpreted to inhibit communications consumers may want and that do not implicate the harms TCPA was designed to prevent.").

Even if the Welcome Message could be viewed as a marketing message – which it cannot (*see* 47 U.S.C. § 227(a)(5)) – the FCC's amendment requiring "prior express *written* consent" for marketing messages did not take effect until October 2013—which is after the texts at issue in this case were sent in May 2013. *See* 47 C.F.R. § 64.1200(a)(3) (effective October 16, 2013). In any event, because all Yahoo users assented to the written terms of service agreements, this assent is deemed "written" under the Electronic Signatures in Global & National Commerce Act. 15 U.S.C. § 7001.

where the defendant submitted "evidence show[ing] that the recipients' fax numbers were collected over time and from a variety of sources, [and therefore] individual inquiries of the recipients [were] necessary to sort out which transmission was consented to and which was not"); *Connelly v. Hilton Grand Vacations, Co., LLC*, 294 F.R.D. 574, 578 (S.D. Cal. 2013) ( "the differing circumstances under which putative class members provided their cell phone numbers to [the defendant] are, at the very least, relevant to a determination of prior express consent"). Further, under Rule 23, plaintiff has the burden of proving that the issue of consent can be determined by generalized proof, irrespective of whether consent is an affirmative defense or an element of plaintiff's claim.[16]

## 1.   Yahoo Obtained "Prior Express Consent" Through Multiple Different Channels

Each of the channels described below is sufficient prior express consent under the TCPA, but because potential class members fall in different (and sometimes overlapping) categories, plaintiff disputes that consent was obtained, and some dispositive questions of consent can only be resolved through individualized factual inquiries, consent cannot be determined on the basis of classwide evidence.

### a.   Express Agreement To Terms Of Service

Each Yahoo user on *at least one* occasion agreed to *at least one version* of one of

---

[16]   *See Booth v. Appstack, Inc.*, No. C13-1533JLR, 2015 WL 1466247, at *10 n.6 (W.D. Wash. Mar. 30, 2015) (whether consent is an affirmative defense or an element of plaintiff's claim "irrelevant for class certification purposes" because "[t]he plaintiff's burden at the class certification phase is to 'advance a viable theory employing generalized proof to establish liability with respect to the class involved'"); *see also Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012) (listing the absence of "prior express consent" as one of "three elements of a TCPA claim"); *Barani v. Wells Fargo Bank, N.A.*, No. 12CV2999-GPC (KSC), 2014 WL 1389329, at *5 (S.D. Cal. Apr. 9, 2014) (Curiel, J.) (while certifying provisional approval of class certification for settlement purposes, noted "the risk that a contested certification motion would not be granted" where "Wells Fargo will likely contend that the requirement of 'generalized proof' of the absence of consent cannot be met because 'consent' cannot be ascertained without an individual inquiry into how Wells Fargo obtained each class member's cellular telephone number, and the circumstances surrounding each text," and that case law interpreting the TCPA "mak[e] it difficult for Class Members to prove lack of consent on a class-wide basis") (citing *Gene & Gene*, 541 F.3d at 327-29).

Yahoo's terms of service agreements, and registered users—including putative class members—would have reaffirmed their assent to these agreements when Yahoo introduced its new mail platform in 2010, or if they registered additional Yahoo accounts or installed a Yahoo application. Andrews Decl. ¶¶ 3, 19. As Judge Koh determined in another case against Yahoo, by affirmatively assenting to the uTOS and/or Comms ATOS, users gave "explicit consent" to Yahoo's conduct (as defined in the agreements):[17]

> Yahoo is correct that Yahoo Mail users agreed to the ATOS. When registering for Yahoo Mail, users must click a "Create Account" button that appears below the sentence: "I agree to the Yahoo Terms and Privacy." The "Yahoo Terms" hyperlink directs users to view the ATOS. . . . Thus, it is clear based on the allegations in the Complaint that Yahoo Mail users agreed to at least the ATOS and Privacy Policy when they created an account. . . . ¶ The Court concludes that the ATOS establishes explicit consent by Yahoo Mail users to Yahoo's conduct.

*In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1028-29 (N.D. Cal. 2014) (citations omitted).[18]

Pathman's argument that the terms of service "govern[s] Yahoo's communications with its users about their Yahoo accounts" but not text messages sent using the PC2SMS Service (Mot. 21), is belied by the express terms of the uTOS and Comms ATOS. Pathman points to nothing in these documents that would limit communications to content about a user's individual "account"; rather, the uTOS and Comms ATOS expressly state that the agreements govern all services provided by Yahoo, and that as a condition of their Yahoo registration, users consent to receiving communications from Yahoo, including via SMS/text message, regarding its services, which includes Yahoo Messenger's PC2SMS system. *See* Andrews Decl. Ex. C (uTOS ¶¶ 2, 24); Ex. A (Comms ATOS ¶ 2(e)).

---

[17]    Pathman and Sherman testified that they know that websites operate subject to terms of service. Boyajian Decl. Ex. K, O (Pathman Dep. 129:22-130:5; Sherman Dep.73:15-74:9).

[18]    Consistent with the Ninth Circuit's ruling in *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014), this Court has held that "[a] modified or hybrid clickwrap/browsewrap agreement constitutes a binding contract where the user is provided with an opportunity to review the terms of service in the form of a hyperlink immediately under the 'I Accept' button and clicks that button." *Crawford v. Beachbody, LLC*, No. 14cv1583-GPC (KSC), 2014 WL 6606563, at *3 (S.D. Cal. Nov. 5, 2014) (Curiel, J.) (citing *Nguyen*, 763 F.3d at 1177); *see also Nguyen*, 763 F.3d at 1176 (ruling that "modified clickwrap" agreements are enforceable "where the user is required to affirmatively acknowledge the agreement before proceeding with use of the website").

21

The uTOS and Comms ATOS provisions are consistent with the Ninth Circuit's construction of "prior express consent" as "'[c]onsent that is clearly and unmistakably stated.'" *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 949, 955 (9th Cir. 2009) (citation omitted); *see also Aderhold*, 2014 WL 794802, at *8 ("[T]he court does not interpret the *Satterfield* panel's declaration that express consent must be 'clearly and unmistakably stated' to require any particular form of consent. In particular, it does not require specific consent to the medium by which a company contacts a consumer. The consumer in *Satterfield* did not consent to be contacted by text message, she merely consented to 'receive promotions' on a form in which she provided her email address and cellular phone number.") (citation and footnote omitted). Indeed, the Notice Provision (uTOS ¶ 24) goes further than the consent provision in *Satterfield* by specifically stating that Yahoo may send users notices via SMS/text.

The Ninth Circuit has held in similar circumstances that these types of individualized inquiries surrounding contract terms preclude class certification. In *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061 (9th Cir. 2014), plaintiff challenged Home Depot's practice of assessing a 10% damage surcharge on tool rentals. The Ninth Circuit affirmed the denial of class certification, because "*[e]ach of the five contracts* used by Home Depot *requires an independent legal analysis* to determine whether the language and design of that contract did or did not suffice to alert customers that the damage waiver was an optional purchase." *Id.* at 1069; *see also id.* at 1070 ("Whether Home Depot's receipt of funds…was unjust or inequitable . . . necessarily rests on individualized determinations about the language of the contract signed by the customer."). The same is true here.

### b.  Users' Voluntarily Provision Of Cell Phone Numbers To Yahoo[19]

In addition to consent through the uTOS and/or Comms ATOS agreements, Yahoo received the requisite consent from putative class members who voluntarily provided their

---

[19]   Should plaintiff rely on dicta from the Court's summary judgment order issued early in this case to argue that providing a phone number to Yahoo does not constitute prior express consent, that position has been expressly rejected by this Court when it denied plaintiff's motion to strike Yahoo's consent affirmative defense. *See* Dkt. 116 at 6:3-5.

mobile numbers to Yahoo in connection with their accounts. *See Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7 FCC Rcd. 8752, 8769 (1992) (stating that "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary"); *Baird v. Sabre Inc.*, 995 F. Supp. 2d 1100, 1107 (C.D. Cal. 2014) (by voluntarily providing her cell phone number to an airline when booking an online reservation and inputting her phone number under "contact information," plaintiff provided prior express consent "to be contacted on her cellphone about flight-related matters" by a third party company hired by the airline to provide flight notification services).

Where an individual, like Pathman, "verifies" her phone number on a TCPA defendant's form, that is also sufficient to constitute prior express consent under the TCPA. *Hudson v. Sharp Healthcare*, 13-CV-1807-MMA (NLS), 2014 WL 2892290 (S.D. Cal. June 25, 2014) (even where number was auto-populated, plaintiff provided prior express consent to receive prerecorded calls regarding her outstanding balance owed to the defendant).[20]

To the extent plaintiff may argue that the scope of her consent was limited when she (or other class members) provided their phone numbers to Yahoo, that argument has been rejected. "The TCPA does not require that calls be made 'for the exact purpose for which the number was provided,' but rather that the call 'bear some relation to the product or service for which the number was provided.'" *Hudson*, 2014 WL 2892290, at *6 (quoting *Olney v. Job.Com, Inc.*, No. 1:12-cv-01724-LJO-SKO, 2014 WL 1747674, at *7 (E.D. Cal. May 1, 2014)); *see also Van Patten*, 22 F. Supp. 3d at 1078 (where plaintiff gave his cellular telephone number to his gym, text was "insulate[d] . . . from a claim under the TCPA"

---

[20]   Other courts have also "found that similar knowing releases of information are sufficient to constitute prior express consent under the FCC Orders." *Hudson*, 2014 WL 2892290, at *5; *see also Van Patten v. Vertical Fitness Grp., LLC*, 22 F. Supp. 3d 1069, 1078 (S.D. Cal. 2014) (finding prior express consent where phone number was copied by defendant onto  membership agreement plaintiff signed); *Murphy v. DCI Biologicals Orlando, LLC*, No. 6:12-cv-1459-Orl-36KRS, 2013 WL 6865772, at *5 (M.D. Fla. Dec. 31, 2013) (even where phone number not specifically requested, provision to the defendants of plaintiff's "cellular phone number constituted his express consent to the Defendants to call him at that number.") (citation omitted).

because the text message "related to the original reason [plaintiff] provided his number: gym membership"); *Roberts v. PayPal, Inc.*, C 12-0622 PJH, 2013 WL 2384242, at *4 (N.D. Cal. May 30, 2013) (plaintiff's provision of his telephone number to PayPal in connection with his PayPal account constituted prior express consent to receive text messages from PayPal "closely related to the circumstances under which plaintiff provided his cell phone number"); *Aderhold*, 2014 WL 794802, at *8 ("[A] consumer at least consents to text messages 'closely related to the circumstances under which plaintiff provided his cell phone number.' . . . [e]ven if [defendant] had made no disclosures at all about the purposes for which it would use [plaintiff's] cellular number. . . When people provide their telephone numbers in commercial transactions, it would be odd to imagine that they do not consent to being contacted for purposes of completing that transaction."). [21]

Here, it is indisputable that users who provided their phone number to Yahoo did so in connection with Yahoo's services, and the message sent pertained to a Yahoo service.[22]

### c.      Consent Through An Intermediary

As illustrated through former named plaintiff Sherman and plaintiffs in the Illinois action, Yahoo may have also obtained prior express consent through an intermediary, i.e., the Yahoo user who sent the PC2SMS text triggering the Welcome Message.

In *GroupMe*, 29 F.C.C. Rcd. 3442 (2014), the FCC recently ruled that this type of consent may be provided by a user of an online platform to send text messages to their friends. GroupMe operated a "group messaging" platform that allowed GroupMe users to create groups and to transmit text messages to all members of that group at the same time. When a number was added to a group, the subscriber of that number would receive a text message from GroupMe. *GroupMe*, 29 FCC Rcd. 3442 ¶ 3. The FCC ruled that consent exists where a consumer provides his or her wireless telephone number to the group

---

[21]      Other jurisdictions are in accord. *See, e.g., Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1113-14, 1124 (11th Cir. 2014); *Ranwick v. Texas Gila, LLC*, 37 F. Supp. 3d 1053, 1055, 1057-58 (D. Minn. 2014).

[22]      As noted below, however, the timing of providing the phone number to Yahoo, i.e., before or after receiving the Welcome Message, is an individualized inquiry that may have a bearing on the scope of consent.

1  organizer, an "intermediary," for the purpose of joining the group. *Id*. ¶¶ 9, 11.[23]

2          While Pathman testified that she did not know the sender of the Yahoo user message,

3  Sherman received the PC2SMS message from his wife's friend, and in the parallel Illinois

4  action, plaintiff Calderin received the text from her coworker, with whom she regularly

5  communicated via text message. Boyajian Decl. Ex. K (Pathman Dep. 164:6-15), Ex. O

6  (Sherman Dep. 133:2-11), & Ex. R (Calderin Dep. 17:20-18:6, Dec. 17, 2014). There is

7  therefore a strong likelihood of consent through an intermediary for these individuals. As

8  further illustrated below (and in Exhibit H to the Doron Declaration), these different factual

9  scenarios underscore that individualized inquiries are necessary to determine whether the

10  class member provided consent through an intermediary.[24]

11

12  [23]     This ruling is consistent with case law holding that consent was provided through a
   third party. *See Mais*, 768 F.3d at 1124-25 (husband provided "prior express consent to
13  receive autodialed or prerecorded calls" through his wife where his wife gave consent to a
   hospital to contact her husband directly); *Baisden v. Credit Adjustments, Inc.*, No. 2:13-cv-
14  992, 2015 WL 1046186, at *6 (S.D. Ohio Mar. 10, 2015) (patients provided prior express
   consent through a hospital to receive autodialed or prerecorded calls from a third-party
15  health care provider); *Lipscomb v. Aargon Agency, Inc.*, No. PWG-13-2751, 2014 WL
   5782040, at *4 (D. Md. Nov. 5, 2014) (patient provided prior express consent through a
16  hospital to receive autodialed calls from a third-party debt collector); *Baird*, 995 F. Supp. 2d
   at 1107 (plaintiff provided prior express consent through Hawaiian Airlines to receive text
17  messages from Hawaiian Airline's contractor).
   [24]     The cases plaintiff relies on to argue that issues of consent should not preclude class
18  certification are factually inapposite. *See* Mot. 21-23.
      • In *Stern v. DoCircle, Inc.*, SACV 12-2005 AG (JPRx), 2014 WL 486262 (C.D. Cal.
19  Jan. 29, 2014), defendant did not provide "any individualized evidence as to the consent of
   other class members." By contrast, Yahoo has provided evidence of putative class members
20  (and named plaintiffs) who have different circumstances regarding consent. *Stern*, 2014 WL
   486262, at *3. *Stern* also held that when "parties present[] individualized evidence of
21  consent," "individualized determinations of consent" are necessary. *Id*.
      • In *Van Patten v. Vertical Fitness Group, LLC*, 12-cv-01614-LAB-MDD, Dkt. No. 54,
22  7:7-13 (S.D. Cal. Nov. 8, 2013), there was a single consent "event" – members providing
   their phone numbers on membership applications. Defendant did not "say that class
23  members could have consented to receiving texts in a number of ways." Kazerounian Decl.
   Ex. L at 8:21-22. By contrast (and as detailed below), Yahoo has provided evidence that
24  class members (including Pathman) could have consented to receiving texts in a number of
   different ways, which cannot be determined based on Yahoo's records and require
25  individualized inquiry.
      • In re *Jiffy Lube Int'l, Inc. Text Spam Litig.*, 847 F. Supp. 2d 1253, 1253-58 (S.D. Cal.
26  2012) is inapposite because (1) it was decided on a motion to dismiss where the court
   refused to take judicial notice of and consider the documents defendant claimed evidenced
27

28

25

## 2. Each Channel Of Consent Involves Numerous Factual Inquiries That Must Be Resolved On An Individual Basis To Establish Liability

Proof of "prior express consent" necessarily involves individualized inquiries because the nature and extent of the consent provided would vary based on the factual circumstances surrounding each putative class member. To illustrate, the relevant factual inquiries include:

- **When did the Yahoo user sign-up for a Yahoo account?** The relevant language of the uTOS changed over time, and the Comms ATOS was not in existence prior to 2010. Where class members received "different disclosures depending" on when they registered an account, individualized inquiries are required. *In re: Google Inc. Gmail Litig.*, No.: 13-MD-02430-LHK, 2014 WL 1102660, at *15 (N.D. Cal. Mar. 18, 2014) (individualized issues regarding consent predominated where Gmail users were provided different terms of service disclosures depending on the educational institution with which they were affiliated).

- **Did the user install any Yahoo software or applications?** If the user did so, they would have had to reassent to the then-current uTOS and/or Comms ATOS. Yahoo has no way of determining this information from its own records. Andrews Decl. ¶ 18.

- **Does a Yahoo user have multiple Yahoo accounts?** Like Pathman and former named plaintiff Sherman, a Yahoo user can have multiple accounts and only associate a phone number to one of those accounts. For example, Pathman's phone number is associated with ███████ but not ███. Because a cross-reference of the Optin DB and UDB can only identify accounts for which a telephone number was associated, it would require an individualized inquiry to determine which of those Yahoo users have another Yahoo ID and

---

consent, and (2) the documents on which putative class members provided their phone numbers in that case were not part of a larger relationship between defendant and individuals, and there certainly was no evidence of an agreement with defendant providing defendant consent to send SMS communications to class members.

- *Kolinek v. Walgreen Co.*, No. 13 C 4806, 2014 WL 3056813 (N.D. Ill. July 7, 2014) was also decided on a motion to dismiss and simply held that when a consumer gives her cellular phone number to a business, she has not given permission to be called at that number for any reason at all. Yahoo does not take that position; rather, the consent provided through the uTOS and Comms ATOS is to receive communications regarding Yahoo services, which includes the PC2SMS system.

the version(s) of the uTOS and/or Comms ATOS agreements assented to by the user.[25]

- **Did the Yahoo user consent to migration to the new mail platform?** The timing of this additional click-through assent, particularly in relation to when the Welcome Message was received and when the phone number was provided to Yahoo, is important.

- **When did the Yahoo user provide a phone number to Yahoo?** This timing is critical relative to the timing of the user's agreement to the uTOS and/or the Comms ATOS agreements (and which version).[26]

- **Is a phone number associated with multiple Yahoo accounts?** If a telephone number is associated with multiple Yahoo accounts (like Pathman's), an individualized inquiry is required to determine who actually belongs in the putative class. *See* Barton Decl. Ex. 5, RJN Exs. 1-5 (documents suggesting ███████ mis-keyed his number because it is only one number different than Pathman's number).

- **Was consent provided by an intermediary?** Only an individual, personal inquiry could answer this question.

A comprehensive illustration of the various factual permutations involved in this analysis is provided in Exhibit H to the Doron Declaration, and further demonstrated by the different ways in which the plaintiffs involved in this case and in the parallel Illinois action have provided consent. For instance, Pathman created her first Yahoo account pre-2007, agreed to the Comms ATOS in 2012, created a second Yahoo account in March 2013, and provided her number to Yahoo *after* receiving the message. Doron Decl. ¶¶ 34-36.

---

[25] This is particularly problematic where the Yahoo ID on the UDB was created after the message was sent because neither Pathman nor Yahoo would be able to identify whether a potential class member consented to receive the message before it was sent through other means, such as through another Yahoo account created before the Welcome Message was sent or by consenting through an intermediary.

[26] Providing a phone number to Yahoo after agreeing to versions of the uTOS and Comms ATOS that expressly provide consent for Yahoo to contact users through SMS, clearly constitutes prior express consent to receive the Welcome Message. *See, e.g.*, *Hudson*, 2014 WL 2892290, at *4-5. Yahoo also reserves the right to argue that Pathman (and other potential class members) who provided their phone number to Yahoo after receiving the Welcome Message ratified the consent under common law contract principles, but for purposes of this opposition, it is sufficient that timing is a relevant, individualized inquiry.

Pathman testified that she did not provide consent through an intermediary. Boyajian Decl. Ex. K (Pathman Dep. 164:6-22). By contrast, Sherman registered at least three Yahoo accounts (one of which was pre-2007, though he could not recall when he created each account (Boyajian Decl. Ex. O (Sherman Dep. 93:4-95:12)), assented to the Comms ATOS, and provided his mobile number to Yahoo *before* he received the Welcome Message.[27] Doron Decl. ¶ 41 (Doron Dep. 137:19-22). The Yahoo user who sent Sherman a message was someone to whom he likely had previously given his phone number – his wife's friend.[28] Like Sherman, named plaintiff Calderin in the parallel Illinois action provided her phone number to Yahoo prior to receiving the message, but unlike Sherman (and Pathman), did so before agreeing to the Comms ATOS. Boyajian Decl. Ex. S (Doron Dep. 205:23-206:12). Calderin and Johnson also likely provided consent through an intermediary. Boyajian Decl. Ex. R (Calderin Dep. 17:20-18:3; 19:15-22; 38:8-22); Ex. Q (Johnson Dep. 59:2-11). These individual consent profiles would not have been developed without extensive individual discovery (including depositions), and demonstrate that similar individualized inquiries would be necessary with respect to each of the potentially ███████ putative class members in order to determine liability. Accordingly, these individualized issues of consent predominate over common questions.

**C.** **Class Action Is Not "Superior" To Individual Prosecution Of Claims.**

The class proposed by Pathman is not the superior way in which to address the claims asserted for at least five reasons: (1) the issues of individualized proof of class membership, liability, and consent set forth above, (2) it does not serve the goals of judicial economy because of the inevitable piecemeal litigation that will result from the one month class definition, (3) the statutory scheme of the TCPA, which was intended to provide a mechanism for consumers to easily and inexpensively bring individual claims for statutory

---

[27]    In light of these facts, Sherman admitted in his deposition that proposed class counsel "decided it wouldn't be in the best interest of the class for me to be" a class representative. Boyajian Decl. Ex. O (Sherman Dep. 10:15-11:20).

[28]    While the other three named plaintiffs would not be part of this class because they do not satisfy the arbitrary criteria that Pathman has set forth with her class definition, these same variations likely exist among the putative class.

damages in small claims court, (4) the aggregate statutory damages would result in an excessive and disproportionate damages award, and (5) many consumers benefit from the PC2SMS system in general, and the Welcome Message in particular, and would not want to be part of the proposed class.

First, a class action is not superior because individualized proof is needed to determine (1) the identities of the subscribers in that same month (membership in the class), (2) whether the Yahoo user provided prior express consent (*see Smith*, 297 F.R.D. at 471 (denying certification where the court found that "it may be impossible—or, at the least, certainly unduly difficult and burdensome—to resolve the issue of express prior consent" on a classwide basis)) and actually received the message,[29] and (3) how to provide notice to the class. To the extent Pathman argues that class members could be sent a notice through their Yahoo email account[30] (Mot. 12), there are class members who cannot be reached via Yahoo email because (a) they closed their accounts and Yahoo no longer has their account information or other contact information (*see* Doron Decl. ¶¶ 18-19), or (b) they do not check their accounts. These types of manageability problems are properly considered in certifying a class. "While notice considerations technically do not come into play until a class is certified, it is proper for a court to consider management difficulties associated with class notice at the precertification stage . . . ." *Agne v. Papa John's Int'l*, 286 F.R.D. 559 (W.D. Wash. 2012) (quoting Newberg on Class Actions § 4:35).[31]

---

[29]     This case is easily distinguishable from *G.M. Sign, Inc. v. Grp. C Commc'ns, Inc.*, No. 08-cv-4521, 2010 WL 744262 (N.D. Ill. Feb. 25, 2010) (Mot. 24:3-4), where the defendant made "hypothetical" and "vague assertions about potential individual issues of consent." *Id.* at *6. As set forth in detail above, just the four named plaintiffs from which Yahoo has obtained individual discovery present vastly different consent profiles – these individualized issues of consent are far from hypothetical.

[30]     The myriad issues with attempting to identify class members through AT&T records are fully set forth in the concurrently filed Aron Declaration.

[31]     The irony of plaintiff's proposal to provide notice to potential class members via their cell phone numbers cannot be overstated. Mot. 12:1-4. Additionally, because the PC2SMS system is not capable of sending a single message ███████████ of times, plaintiff would have to hire a third-party vendor to send the messages and that third-party would indisputably not have obtained consent (unlike Yahoo, which obtained consent through at least the uTOS and/or Comms ATOS).

Second, the class action that Pathman has proposed is not superior because with her arbitrarily revised class definition, individuals would be required to pursue piecemeal litigation, not a true class action. This is evidenced by the parallel Illinois action, which seeks certification of completely different classes – those based on different time periods and cell phone carriers. Based on the way Pathman (and her lawyers, who are also counsel in the Illinois action) have divided the class, Yahoo would now be facing potentially dozens of class actions for each month and each carrier carved out from plaintiff's original class definition.[32] Indeed, even the original named plaintiff, Sherman (who Pathman sought to dismiss because he would not fit into her arbitrary class), could now file another lawsuit against Yahoo. *See* Dkt. 106 (dismissing Sherman without prejudice).

This inefficient and potentially inconsistent result is precisely what the class action mechanism is intended to avoid. *See Mevorha v Wels Fargo Home Mortg. (in re Wells Fargo Home Mortg. Overtime Pay Litig.)*, 571 F.3d 953, 958 (9th Cir. 2009) ("A principal purpose behind Rule 23 class actions is to promote 'efficiency and economy of litigation.' *Am. Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 553 . . . (1974). In particular, Rule 23(b)(3)'s predominance and superiority requirements were added 'to cover cases "in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."'") (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 615, (1997) (quoting Fed. R. Civ. P. 23(b)(3) Adv. Comm. Notes to 1966 Amendment)); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) ("In determining superiority, courts must consider the four factors of Rule 23(b)(3). 'A consideration of these factors requires the court to focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis.'") (quoting 7A CHARLES ALAN WRIGHT, ET. AL., FEDERAL PRACTICE & PROCEDURE § 1780, at 562 (2d ed.1986), *op.*

---

[32]   This piecemeal litigation, including the current proposed classes and the other month classes that are likely to emerge if this class is certified, will lead to a "race" among the classes, with each class vying to get paid first.

1   *amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001)).

2   Third, the individual prosecution of claims is superior because the TCPA provides

3   for statutory damages and does not provide for attorneys' fees, meaning that a claimant's

4   recovery will not be diminished by attorneys' fees. Indeed, Congress contemplated that

5   TCPA claims could easily be brought as small claims court actions (and the original bill did

6   not even provide that such claims could be brought in federal court – nor was it even clear

7   that federal litigation was permissible before the Supreme Court's ruling in *Mims v. Arrow*

8   *Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012) (holding that "federal and state courts have

9   concurrent jurisdiction over private suits arising under the TCPA"); *see also* 137 Cong.

10  Rec. S16204-01, 1991 WL 229525 (daily ed. Nov. 7, 1991) (statement of Sen. Hollings,

11  the TCPA's sponsor) ("it is my hope that States will make it as easy as possible for

12  consumers to bring [TCPA claims], preferably in small claims court [and] it would defeat

13  the purposes of the bill if the attorneys' costs to consumers of bringing an action were

14  greater than the potential damages"); 137 Cong. Rec. S9840-02, 1991 WL 126847 (daily

15  ed. July 11, 19910 (statement of Sen. Hollings) (the TCPA as introduced to Congress, not

16  providing federal jurisdiction for consumer actions under the statute)). The availability of

17  statutory damages creates an "adequate incentive" for individuals to bring suit on their own

18  behalf. *See Smith*, 297 F.R.D. at 469 ("The TCPA allows a litigant to seek statutory

19  damages of $500 for each violation, and potentially treble damages if the court finds the

20  defendant to have acted willfully or knowingly."); *Forman v. Data Transfer, Inc.,* 164

21  F.R.D. 400, 404 (E.D. Pa. 1995) ("The [TCPA's] statutory remedy is designed to provide

22  adequate incentive for an individual plaintiff to bring suit on his own behalf."). "Even

23  though the TCPA, unlike many consumer protection statutes, does not provide for

24  attorney's fees, an alternative method of handling the instant controversy exists: namely,

25  individual plaintiffs may bring TCPA cases in small claims court without an attorney."

26  *Smith*, 297 F.R.D. at 469 (citing 47 U.S.C. § 227(b)(3); *Mims* 132 S. Ct. at 740; *Cellco*

27  *P'ship v. Wilcrest Health Care Mgmt. Inc.*, Civil Action No. 09-3534 (MLC), 2012 WL

28  1638056, at *8 (D.N.J. May 8, 2012) (citing 137 Cong. Rec. S16,204 (daily ed. Nov. 7,

1991) (statement of Sen. Hollings)) (explaining that Congress intended plaintiffs to pursue their TCPA claims in state small claims courts)).

Fourth, a class action is not superior because aggregation of statutory damages would result in an excessive and disproportionate damages award, particularly when plaintiff suffered no actual harm. *See Kline v. Coldwell, Banker & Co.*, 508 F.2d 226, 235 (9th Cir. 1974) (reversing district court's certification of class because aggregation of damages across thousands of class members risks creating a disproportionate penalty that renders class adjudication not superior to individual actions). *But see Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 719 (9th Cir. 2010) (holding that a district court abused its discretion in considering the proportionality of the potential liability to the actual harm in its superiority analysis); *see also State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003) (holding that due process requires that a punitive award "have a nexus to the specific harm suffered by the plaintiff").[33]

Fifth, as set forth in the expert declaration of Danah Boyd, the PC2SMS system offers a tremendous benefit to consumers, and as a result, many would not want to participate in this class action. Boyd Decl. ¶¶ 7, 15, 16 (explaining that the PC2SMS system bridges a communication gap and facilitates electronic communication for many segments of society). And more specifically, the Welcome Message itself is a desirable consumer communication because "1. It allows the cell phone user to understand the context of the directed message that is received. 2. It gives the cell phone user a pathway for opting out of the service." *Id.* ¶ 19. If a class were to be certified, the helpful Welcome Message, and potentially the PC2SMS service as a whole, would be discontinued to the detriment of many class members. *Id.* ¶ 20. Accordingly, not only is a class action not

---

[33]    Yahoo also reserves its defense that plaintiff (and the putative class) lack Article III standing, and class certification should be denied on this additional ground in light of the Supreme Court's decision to grant certiorari in *Robins v. Spokeo, Inc.*, 742 F.3d 409 (9th Cir. 2014), *cert granted*, 82 U.S.L.W. 3689 (U.S. Apr. 27, 2015) (No. 13-1339), and notwithstanding the Ninth Circuit's decision in *Edwards v. First American Corp.*, 610 F.3d 514 (2010) (holding plaintiff had Article III standing despite having suffered no monetary loss or other direct injury). Here it is undisputed that Pathman incurred no out-of-pocket harm or injury. Boyajian Decl., Ex. K (Pathman Dep. 120:16-25).

superior to individual prosecution of claims, but the claims themselves are not ones that would likely be pursued by a large number of consumers because of the vast benefits of the system in general and the Welcome Message specifically. Those who do wish to pursue a claim should do so individually and pursuant to the statutory scheme providing for statutory damages.

**D.    Pathman Is Not An "Adequate" Or "Typical" Class Representative**

Even if the Court were to conclude that this is a class that should be certified, Pathman is not an adequate or typical class representative[34] for at least three reasons: (1) Pathman's method of consent differs from many other class members', (2) Pathman's history of settling putative class actions for her own benefit, and (3) Pathman's spoliation of evidence in this case raises unique defenses.

First, Pathman is an inadequate representative and her claims are not typical because of the manner in which she provided consent (i.e., timing of registration of accounts, re-affirming assent to uTOS and ATOS, creation of additional accounts, providing phone number to Yahoo after receiving the Welcome Message, no consent through intermediary) will only coincide with a select group of members of the putative class, and thus may provide incentives for her to litigate the case in a certain manner or seek a settlement that benefits her to the detriment of other class members. Even the other former named plaintiff, Sherman, has a dramatically different consent profile (e.g., provided Yahoo his cell phone

---

[34]    Rule 23(a) requires that a class representative "fairly and adequately protect the interests of the [other members of the] class." Fed. R. Civ. P. 23(a)(4). The Court must consider whether (1) Pathman and her counsel have any conflicts of interest with other class members, and (2) Pathman and her counsel will prosecute the action vigorously on behalf of the class. *See Hanlon v. Chrysler Corp*, 150 F.3d 1011 at 1020 (9th Cir. 1998); *see also Bodner v. Oreck Direct, LLC*, No. 06-4756, 2007 WL 1223777, at *2 (N.D. Cal. Apr. 25, 2007) (a plaintiff is not an adequate representative when it is "clear from the record that plaintiff's counsel, and not plaintiff is the driving force behind the action.").

The typicality requirement serves as a "'guidepost[] for determining whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Fine v. ConAgra Foods, Inc.*, No. CV 10-01848 SJO (CFOx), 2010 WL 3632469, at *3 (C.D. Cal. Aug. 26, 2010) (holding that class representative's claims not typical where each class member would have seen and/or relied on different statements) (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982)).

number prior to receiving the Welcome Message, likely provided consent through an intermediary). If Pathman is deemed to have provided consent through one of the avenues identified above, then she does not have a claim and cannot represent those class members who did not provide consent. If she is deemed not to have provided consent, she cannot represent those class members who did provide consent (e.g., through an intermediary, by providing their phone number to Yahoo prior to being sent the Welcome Message). This puts her interests in conflict with some members of the putative class. *See CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011) (remanding to district court to reconsider finding that class representative adequate where defendant presented evidence of a consent defense to the named class representatives claims). Further, Pathman's arbitrarily constructed class excludes the people most likely to raise a claim against Yahoo, namely, individuals who did not expressly agree to be contacted by Yahoo (though some may have nonetheless provided consent through other means).

Second, Pathman is an inadequate representative because she has a history of settling putative class action lawsuits, including TCPA suits, prior to certification for her own personal benefit (and that of her attorneys). Her deposition testimony confirmed that in all the class action lawsuits in which she has been a named plaintiff, no other putative class members have benefited in any way from her filing of the lawsuit. Boyajian Decl. Ex. K (Pathman Dep. 261:10-21). In this case, she is even more likely to settle the case for her own personal benefit prior to certification because she will likely be found to have given consent to receive the Welcome Message through her numerous expressions of assent to the relevant terms of service and her voluntarily provision of her mobile number to Yahoo.

Third, as noted above, Pathman destroyed critical evidence in this case by (1) deleting the Welcome Message, and (2) discarding the handset on which she received the Welcome Message without making any effort to specifically preserve the Welcome Message. Boyajian Decl. Ex. N. These unique spoliation issues will necessitate litigation (and perhaps settlement) strategies that could be detrimental to the class she seeks to represent. *See Hanon v. Dataprods. Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) ("motion for

34

class certification should not be granted if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it'" and where the class representative's "unique background and factual situation require him to prepare to meet defenses that are not typical of the defenses which may be raised against other members of the proposed class.") (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2d Cir.1990)), *superseded by statute on other grounds, Berger v. Ludwick,* No. C-97-0728-CAL, 2000 WL 1262646 (N.D. Cal. Aug. 17, 2000).

**E.      Plaintiff Has Not Met Her Burden Of Proposing A Trial Plan**

The "rule in the Ninth Circuit" is that plaintiffs, as the proponents of class certification, "bear[] the burden of presenting a workable trial plan."  *Galvan v. KDI Distrib.*, 2011 WL 5116585, at *12 n.10 (C.D. Cal. Oct. 25, 2011); *see also Zinser*, 253 F.3d at 1189 (plaintiff "bears the burden of demonstrating a suitable and realistic plan for trial of the class claims"); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (reversing certification order where "[t]here has been no showing by Plaintiffs of how the class trial could be conducted").  The obligation to present a workable trial plan is not "optional," *Galvan*, 2011 WL 5116585, at *12 n.10, because there is a "critical need" to determine how a class will *actually* be tried through a "full and clear articulation of the litigation's contours at the time of class certification." *Wachtel v. Guardian Life Ins. Co.*, 453 F.3d 179, 186 (3d Cir. 2006) (quoting Fed. R. Civ. P. 23(c)(1)(A), adv. comm. note).

Here, plaintiff has not offered any proposal for how this action will be tried, including identifying the class members, determining issues of liability, and distributing any classwide relief. The absence of any trial plan underscores the unmanageability of the proposed class.

## V. **CONCLUSION**

The proposed class fails to meet Rule 23's requirements and should not be certified.

Dated:  May 8, 2015                              GREENBERG TRAURIG, LLP
                                                          IAN C. BALLON
                                                          LORI CHANG
                                                          NINA D. BOYAJIAN

35

JUSTIN A. BARTON

By:   */s/ Ian C. Ballon*
        Ian C. Ballon
Attorneys for defendant Yahoo! Inc.
Email: Ballon@gtlaw.com

36

**CERTIFICATE OF SERVICE**

I hereby certify that on <u>May 8, 2015</u>, I caused to be filed electronically document(s) described as: **[REDACTED] DEFENDANT YAHOO! INC.'S OPPOSITION TO PLAINTIFF SUSAN PATHMAN'S MOTION FOR CLASS CERTIFICATION** with the Clerk of the Court using the Court's CM/ECF system which will send notification of such filing to the e-mail addresses denoted below:

Kazerouni Law Group, APC
Abbas Kazerounian, Esq.
Jason A. Ibey, Esq.
245 Fischer Avenue, Suite D1
Costa Mesa, CA 92626
Tel: 800-400-6808; Fax: 800-520-5523
ak@kazlg.com; jason@kazlg.com
*Counsel for Plaintiff Susan Pathman*

Hyde & Swigart
Joshua B. Swigart, Esq.
Robert L. Hyde, Esq.
2221 Camino Del Rio South, Suite 101
San Diego, CA 92108
Tel: 619-233-7770; Fax: 619-297-1022
josh@westcoastlitigation.com; bob@westcoastlitigation.com
*Counsel for Plaintiff Susan Pathman*

Vincent L. DiTommaso, Esq.
DiTommaso Lubin, P.C.
17W220 22nd Street, Suite 410
Oakbrook Terrace, IL 60181
Tel: 630-333-0000
vdt@DiTommasolaw.com
*Counsel for Plaintiff Susan Pathman*

By:   <u>/s/  Ian C. Ballon</u>
        Ian C. Ballon
Email: Ballon@gtlaw.com